O. Lee TAWES, III, Appellant,

v.

Doris BARNES, Individually and as Independent Executrix of the Estate of Leon McNair Barnes, Deceased, Appellee.

No. 10–0581.

Supreme Court of Texas.

Argued Nov. 9, 2010.

Decided April 15, 2011.

Rehearing Denied June 10, 2011.

Barnet B. Skelton Jr., Barnet B. Skelton, Jr., PC, Russell S. Post, David M. Gunn, Beck Redden & Secrest, L.L.P., Houston, for O. Lee Tawes, III.

Thomas Kirkendall, The Woodlands, Dick Watt, Hannah Sibiski, Watt Beckworth Thompson & Henneman, LLP, Houston, for Doris Barnes.

---

Justice GREEN delivered the opinion of the Court.

In this case, which arose from an oil and gas lessor's claim for unpaid royalties, we consider the construction and application of a Working Interest Unit Agreement (WIUA) and a Joint Operating Agreement (JOA). The issues come to us on certified questions from the United States Court of Appeals for the Fifth Circuit. The Fifth Circuit asks first whether the lessor here, either as a third-party beneficiary or through privity of estate, can enforce the WIUA and JOA to recover unpaid royalties from an investor who consented to the drilling of two wells on a pooled gas unit, but did not operate the wells. *See In re Moose Oil & Gas Co.*, 613 F.3d 521, 531 (5th Cir.2010). Pursuant to Article 5, Section 3–c of the Texas Constitution and Texas Rule of Appellate Procedure 58.1, we answer this question in the negative, and therefore do not reach the Fifth Circuit's remaining certified questions.

## I. Background

Moose Oil & Gas Company acquired several oil, gas, and mineral leases in Lavaca County (collectively, the Baker Lease). Moose sold a portion of its working interest in the Baker Lease to a group of investors (the Moose Assignees), including O. Lee Tawes, III. The owners of the land adjoining the Baker Lease, Leon M. Barnes, now deceased, and his wife, Doris Barnes, executed an oil and gas lease (the Barnes Lease) to American Exploration Company. Through a series of assignments, Dominion Oklahoma Texas Exploration & Production, Inc. eventually succeeded to American's interest as the Barneses' lessee.

In preparation for a contemplated joint drilling venture on the lands covered by the Baker and Barnes leases, Dominion, Moose, and the Moose Assignees, including Tawes, signed a WIUA and a JOA. These unambiguous agreements, referred to here collectively as the Dominion–Moose Agreements, provided for the initial drilling of one gas well. Beyond the drilling of the initial well, the JOA permitted any party to the Dominion–Moose Agreements to propose additional drilling operations. In the event a dispute arose regarding the likelihood that an additional well would actually produce in paying quantities, the JOA allowed any party to protect itself from the risk and expense associated with the proposed additional drilling by going non-consent, or opting out of participating in the operation. These risks would then be borne by the consenting parties in exchange for the non-consenting parties' temporary relinquishment of their "interest in the [non-consent] well and share of production therefrom." After a specified period of time, each non-consenting party's interest in the non-consent well would revert back to that party so that its ownership interest in the well would be the same as if it had participated in the drilling from the outset.

The WIUA provides in relevant part: [1]

## PROVISION III
### LEASE BURDENS

Each Party hereto shall bear and be responsible for their own lease burdens including, but not limited to their Lessor's royalty, overriding royalty along with any and all other royalty burdens which may have been created by the party contributing the lease or leases to this Working Interest Unit.

## PROVISION IV
### OPERATIONS

[Dominion] is designated Operator of the Working Interest Unit which will be governed by the Operating Agreement attached hereto. . . .

## PROVISION VI
### LEASE RENTALS

Rentals, shut-in payments, or minimum royalties which may become due on leases committed hereto shall be paid by the contributor of the lease to the Working Interest Unit. It is the obligation of the contributing Lessee to maintain its own lease or Leases subject to this Agreement.

Dominion and Moose utilized the American Association of Petroleum Landmen's (AAPL) Form 610–1982 Model Form Operating Agreement as the basis for their JOA making several minor modifications to the standard terms. The JOA provides in relevant part:

## ARTICLE III.
### INTERESTS OF PARTIES

. . . .

B. Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in op-

erations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in [the WIUA].

## ARTICLE VI.
### DRILLING AND DEVELOPMENT

. . . .

B. Subsequent Operations:

. . . .

2. *Operations by Less than All Parties:*

. . . .

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear. . . . Upon commencement of operations for the drilling . . . of any such well by Consenting Parties in accordance with the provisions of this Article, each Non–Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non–Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share . . . shall equal the total of the following:

a) 100% of each such Non–Consenting Party's share of the cost of any newly acquired surface equipment . . . plus 100% of each such Non–Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non–Consenting Party's relinquished interest shall revert to it . . .; and

---

1. We have replaced Louis Dreyfus Natural Gas Corporation, the original operator designated by the WIUA, with Dominion, who ac-quired Louis Dreyfus's interest as lessee of the Barnes lease when the companies merged in 2001.

b) 400% of that portion of the costs and expenses of drilling ... and 400% of that portion of the cost of newly acquired equipment in the well....

. . . .

a) During the period of time Consenting Parties are entitled to receive Non–Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non–Consenting Party's share of production....

. . . .

## ARTICLE VII.
## EXPENDITURES AND LIABILITY OF PARTIES

C. Payments and Accounting:

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder....

. . . .

E. Rentals, Shut-in Well Payments and Minimum Royalties:

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the Operator and billed to the Joint Account....

In July 1998, Dominion and Moose, acting for itself and on behalf of Tawes and the other Moose Assignees, formed the pooled gas unit (the Baker Unit) contemplated at the time they executed the Dominion–Moose Agreements.[2] Of the total 640 pooled acres, the Barnes Lease comprised approximately 54% of the land. Initially, the Dominion–Moose Agreements designated Dominion as the operator of all wells drilled on the Baker Unit. After the initial well, David Baker No. 1, was successfully drilled, Moose proposed drilling two additional gas wells, the Baker–Barnes No. 1 and No. 2 wells. Tawes and Moose consented to the proposed additional drilling, while Dominion opted to go non-consent. Because non-consenting parties cannot act as operators, Moose replaced Dominion as the operator of the two non-consent wells.

In addition to bearing all costs associated with drilling the non-consent wells, JOA Article VI.B.2 required the consenting parties to pay the royalties which would have been owed to the lessors of leases contributed to the Baker Unit by the non-consenting parties had they consented to the additional operations from the beginning. This provision, which we refer to as the JOA Royalty Provision, is principally at issue here.

The parties do not dispute that Barnes owns a 9.675% royalty in each well drilled on the Baker Unit. In 2000, Barnes, individually and as the independent executrix of her late husband's estate, commenced an action against Moose and Dominion in a Lavaca County state district court seeking to recover an additional 8.241% or, 17.916% total, royalty on the Baker–Barnes No. 1 and No. 2 non-consent wells. In response to Barnes's suit, Dominion filed a counterclaim and joined Tawes and the other Moose Assignees. In 2002, Dominion removed the entire action to the United States Bankruptcy Court for the

---

**2.** See the attached Appendix for a diagram of the parties' interests and participation in the drilling operations occurring on the Baker Unit.

Southern District of Texas, Houston Division, after Moose filed a voluntary Chapter 7 bankruptcy petition. The bankruptcy court appointed an operator to replace Moose and ordered all proceeds from production on the non-consent wells to be placed in suspense accounts. At a February 2002 foreclosure sale, Tawes acquired Moose's undivided working interest in the Baker Unit as well as in the non-consent, Baker–Barnes No. 1 and No. 2 wells. In September 2003, the bankruptcy court granted a partial summary judgment in favor of Barnes, holding Dominion liable for $291,846.00—the unpaid amount of Barnes's undisputed 9.675% royalty on the Baker–Barnes No. 1 and No. 2 wells. Dominion then sought contribution from Moose, Tawes, and the other Moose Assignees. Barnes, however, continued to pursue her claims against Dominion for the full 17.916% royalty she claimed she was owed on each Baker Unit well. Before her claims against Dominion proceeded to trial, Barnes reached a settlement with Dominion and all consenting parties in which Dominion agreed to pay Barnes a sum of money in return for Barnes and the settling consenting parties' dismissal of claims against Dominion. Tawes declined to participate in the settlement. Barnes, therefore, sought to recover the balance of her remaining unpaid royalties from Tawes.

After considering the merits of Barnes's claims against Tawes, the United States Bankruptcy Court determined that as a JOA signatory, Tawes became obligated under the terms of the JOA Royalty Provision to perform Dominion's duty of paying Barnes the lessor's royalty owed to her pursuant to the Barnes Lease. *Barnes v. Dominion Ok. Tex. Exploration & Prod., Inc. (In re Moose Oil & Gas Co.)*, 347 B.R. 868, 874 (Bankr.S.D.Tex.2006). Based on this conclusion, the bankruptcy court found Tawes liable to Barnes, as a third-party beneficiary of the Dominion–Moose Agreements, for her unpaid royalties. *Id.* From this decision, Tawes appealed to the United States District Court for the Southern District of Texas. The federal district court affirmed the bankruptcy court's decision, concluding that Barnes qualified as a third-party beneficiary of the Dominion–Moose Agreements because the JOA Royalty Provision expressly obligated Tawes, as a consenting party, to pay the royalties previously owed by Dominion to Barnes. *Tawes v. Barnes,* No. V–06–123, 2008 WL 905209, at *10, *17 (S.D.Tex. Mar. 31, 2008). Following the federal district court's holding, Tawes appealed once more, this time to the United States Court of Appeals for the Fifth Circuit, resulting in the certified questions of law now before us:

1. Does Barnes have any right [to] enforce the [Dominion–Moose Agreements]—the WIUA and JOA—between Dominion, Moose ... and the Moose Assignees, including Tawes, to recover unpaid royalties, between the date of first production and February 2002, of Baker–Barnes Nos. 1 & 2 wells under what we have called the "Royalty Provision" of the JOA, either as a third-party beneficiary of the WIUA and JOA or by virtue of having privity of estate with Tawes?

. . . .

2. If Barnes may enforce the [Dominion–Moose Agreements], does the WIUA prevent Barnes from recovering from Tawes?

. . . .

3. If Tawes, as a Consenting Party, is responsible for royalties under the JOA, does the JOA Royalty Provision change the agreement within the JOA such that Tawes is responsible for all of Barnes'[s] unpaid royalty jointly and severally, or

does the JOA limit Tawes'[s] liability for unpaid royalty to the extent of his interest in the two wells at issue between the date of first production and February 2002?

*In re Moose Oil & Gas Co.,* 613 F.3d at 531.

## II. Discussion

In claiming she is entitled to recover unpaid royalties from Tawes, Barnes relies heavily on the language found in the JOA Royalty Provision. She first contends that, based on that language, she qualifies as a third-party beneficiary to the Dominion–Moose Agreements. Alternatively, she asserts that the privity of estate she shares with Tawes supports her ability to enforce the Dominion–Moose Agreements. We address each argument in turn.

### A. Third–Party Beneficiary

 A third party may enforce a contract it did not sign when the parties to the contract entered the agreement with the clear and express intention of directly benefitting the third party. *MCI Telecomms. Corp. v. Tex. Util. Elec. Co.,* 995 S.W.2d 647, 651 (Tex.1999). When the contract confers only an indirect, incidental benefit, a third party cannot enforce the contract. *Id.; see also* RESTATEMENT (SECOND) OF CONTRACTS § 315 (1981); 13 WILLISTON ON CONTRACTS § 37:19, at 124–25 (4th ed. 2000) ("An incidental beneficiary acquires no right either against the promisor or the promisee by virtue of the promise."). Traditionally, Texas courts have maintained a presumption against third-party beneficiary agreements. *Corpus Christi Bank & Trust v. Smith,* 525 S.W.2d 501, 503–04 (Tex.1975) ("[W]e must begin with the presumption that parties contract for themselves...."); *Standard Accident Ins. Co. v. Knox,* 144 Tex. 296, 184 S.W.2d 612, 615 (1945). Therefore, in the absence of a clear and unequivocal expression of the contracting parties' intent to directly benefit a third party, courts will not confer third-party beneficiary status by implication. *MCI,* 995 S.W.2d at 651.

 To determine whether Dominion and Moose expressed a clear intent to directly benefit Barnes, we must interpret the Dominion–Moose Agreements, which both parties agree are unambiguous. *Id.* at 650. The construction of an unambiguous contract is a question of law for the court, which we may consider under a de novo standard of review. *See Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.,* 297 S.W.3d 248, 252 (Tex.2009); *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983). When discerning the contracting parties' intent, courts must examine the entire agreement and give effect to each provision so that none is rendered meaningless. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex.2006); *Stine v. Stewart,* 80 S.W.3d 586, 589 (Tex.2002) (per curiam). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Coker,* 650 S.W.2d at 393. All doubts must be resolved against conferring third-party beneficiary status. *See MCI,* 995 S.W.2d at 652.

Barnes claims that the JOA Royalty Provision directs Tawes, as a consenting party, to pay the royalties owed to her pursuant to her oil and gas lease with Dominion. Because the payment of royalties to Barnes would satisfy a legal duty owed by Dominion, her lessee, Barnes argues she received a direct, non-incidental benefit, and therefore qualifies as a third-party beneficiary. Tawes responds that the parties to the Dominion–Moose Agreements relied on the JOA to govern the relationships between the operators and non-operators of wells drilled on the Baker

Unit. By allocating general expenses among the parties consenting to the drilling of additional, non-consent wells, Tawes asserts that the JOA Royalty Provision was not intended to directly benefit any lessor of a Baker Unit lease, but to provide clarity to the operator who must keep an accurate record of accounting. We consider Tawes's position to be more accurate and conclude that the parties did not intend to directly benefit Barnes. Rather, any benefit received by her was merely incidental.

■ As Tawes's contentions recognize, JOAs are "contract[s] typical to the oil and gas industry whose function is to designate an 'operator, describe the scope of the operator's authority, provide for the allocation of costs and production among the parties to the agreement, and provide for recourse among the parties if one or more default in their obligations.'" *Seagull*, 207 S.W.3d at 344 n. 1 (quoting 3 ERNEST E. SMITH & JACQUELINE L. WEAVER, TEXAS LAW OF OIL AND GAS § 17.3 at 17–7 (2d ed. 2006)). JOAs govern operations involving great financial risk and are therefore utilized for the purpose of shielding non-operators, like Tawes, "from liability for all costs or other obligations incurred in conducting the operations." 3 ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS § 17. 1, at 377 (1996); *see Hill v. Heritage Res.*, 964 S.W.2d 89, 112 (Tex.App.-El Paso 1997, pet. denied). We deduce from the oil and gas industry's customary purpose for using JOAs, and from the plain language of the JOA at issue here, that neither Dominion nor Moose included the JOA Royalty Provision with the intention of directly benefitting any lessor of a Baker Unit lease. *See Luling Oil & Gas Co. v. Humble Oil & Ref. Co.*, 144 Tex. 475, 191 S.W.2d 716, 724

(1946) ("'Not only are we to construe this contract as a whole but since it is one peculiar to the cotton export trade, and somewhat indefinite or inconsistent in its terms, we may interpret it in the light of the custom of the business....'" (quoting *Perry & Co. v. Langbehn*, 113 Tex. 72, 252 S.W. 472, 474 (1923))).

For instance, WIUA Provisions III and VI, quoted above, provide that Baker Unit lessees must maintain and prevent their respective leases from terminating by paying royalties and other expenses, such as rentals and shut-in payments. The plain language of these WIUA provisions makes clear that Dominion, as the contributor of the Barnes Lease to the Baker Unit, was ultimately responsible for paying its lessor, Barnes, the royalties from production owed to her pursuant to the terms of the Barnes Lease. *See Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, No. 05–1076, 2011 WL 1226100, at *12 (Tex.2011) ("[T]echnical words are to be interpreted as usually understood by persons in the business to which they relate, unless there is evidence that the words were used in a different sense."). Because the royalties Barnes seeks arise of out production from one of the non-consent wells, we must also look to the provisions of the JOA which discuss operations conducted without the consent of all parties.[3]

Article III.B of the JOA states that unless otherwise provided, each party will be charged with the costs and liabilities associated with drilling Baker Unit wells as their interests are set forth in the WIUA. Article VI.B.2, the JOA Royalty Provision, provides an exception to this general accounting scheme: When less than all parties consent to the drilling of additional wells, the responsibility for pay-

**3.** Provision IV of the WIUA expressly incorporates the terms of the JOA into the WIUA so

that the operation of the Baker Unit is governed simultaneously by both agreements.

ment of "all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non–Consenting Party's share of production" shifts to the consenting parties only. JOA Article VII provides the operator of non-consent wells an accounting procedure which directs it to charge all costs and expenses incurred in drilling to a joint account so that the consenting parties may be billed with their respective proportionate shares. Along with the general cost items contained in the Royalty Provision, Article VII directs operators to bill additional types of operating expenses to the joint account, including: ecological and environmental charges, rentals and royalties, labor costs, employee benefits, material and transportation costs, service fees, equipment and facilities charges, damages and losses to joint property, legal expenses, taxes, insurance fees, abandonment and reclamation costs, communications fees, and other expenditures directly benefitting the joint property. As a matter of common understanding, each of these categories of expense would accrue and become payable to different people and entities. *See Exxon Corp.*, 2011 WL 1226100, at *12. Aside from the generalized categories of expense the JOA Royalty Provision obligates consenting parties to pay, Article VII's detailed breakdown of the operational costs associated with drilling adds further clarification to the types of expenses operators may bill to the consenting parties' joint account.

In relation to the two non-consent wells at issue here, Moose served not only as operator, but also as a consenting party. As operator, Moose assumed responsibility for, among other things, paying all lessors of Baker Unit leases, including Barnes, royalties accruing on production from the non-consent wells it operated. Such royalty payments would then be billed to the joint account to be split proportionately among Moose, Tawes, and the other consenting parties. The Dominion–Moose Agreements demonstrate that the clear intent of the signatories thereto was to allocate responsibilities for the payment of operating expenses for the specific purpose of maintaining each Baker Unit lease, not to directly benefit Barnes.

Finally, denial of Barnes's third-party beneficiary claim comports with established Texas case law. The Fifth Circuit, while addressing this issue, found the facts of this case to lie somewhere between our opinions in *Stine v. Stewart*, 80 S.W.3d 586 (Tex.2002), and *MCI Telecommunications Corp. v. Texas Utilities Electric Co.*, 995 S.W.2d 647 (Tex.1999). In *MCI*, we interpreted a fiber optic cable installation contract between a railroad company and a telecommunications provider to determine whether the contract conferred third-party beneficiary status on a utility company that had previously installed transmission poles along the same portion of railway. *Id.* at 648–49. The contract at issue prohibited the telecom provider from acting in a manner that would interfere with the utility company's prior existing rights in the railway. *Id.* at 649. However, the contract also contained a provision stating "neither this Agreement, nor any term or provision hereof, ... shall be construed as being for the benefit of any party not in signatory hereto." *Id.* at 649–50. We concluded that the protections provided to the utility company were merely an incidental benefit and determined that the contract's specific denial of conferring any benefits upon third parties showed the signatories' clear intent "that there be no third-party beneficiaries to the contract." *Id.* at 651–52.

In *Stine*, we addressed a similar issue— whether a mother qualified as a third-party beneficiary to her daughter and son-in-law's agreement incident to divorce. *Id.*

at 588. The agreement disposed of the couple's marital property and included a detailed plan by which the couple would repay a loan taken from the mother to purchase their home. *Id.* We determined that the agreement contained the requisite clear and unequivocal language of intent to directly benefit a third party, because it provided for the repayment of a specific amount of money to the mother from a specific source of income—proceeds from the sale of the couple's home. *Id.* at 590. Further, the agreement referenced a promissory note held by the mother which demonstrated the husband and wife's desire to satisfy the existing legal obligation they owed to the mother. *Id.* These provisions directly benefitted the mother, so we held that she was entitled to enforce the agreement as a third-party beneficiary. *Id.*

We do not find it determinative that the 1982 version of the AAPL's Model Form JOA used here does not expressly waive third-party liability like the contract at issue in *MCI*. *See Coker,* 650 S.W.2d at 393 (stating that when construing a contract to determine parties' intent, no single provision is given controlling effect). Instead, the controlling factor is the absence of any sufficiently clear and unequivocal language demonstrating an intent to directly benefit Barnes or any other would-be beneficiary of the contract. The Dominion–Moose Agreements here clearly lack such required language. Moreover, unlike the divorce agreement in *Stine,* the JOA here does not, as the Fifth Circuit states, identify a "specific, limited group of individuals" to which the consenting parties owe an obligation. *Compare In re Moose Oil & Gas Co.,* 613 F.3d at 528, *with Stine,* 80 S.W.3d at 588. To the contrary, the JOA Royalty Provision refers only to consenting and non-consenting parties generally. In addition, the JOA Royalty Provision does not identify a specific sum which the consenting parties must pay to a certain person or entity. As discussed above, the JOA accounting procedure for non-consent wells directs Moose, as operator of the non-consent wells, to bill a wide variety of expenses to the consenting parties' joint account. This accounting procedure ensures that all lessors of Baker Unit leases, not Barnes alone, would receive royalties from production realized on the non-consent wells.

Although we recognized in *Stine* that it is not necessary for a third-party beneficiary agreement to be executed solely for the would-be beneficiary's benefit, we determined that the contract there referred to the third-party beneficiary with sufficient specificity to illustrate a clear intent to repay a debt owed. 80 S.W.3d at 591–92. The generalized nature of the JOA Royalty Provision, coupled with the JOA's all-encompassing accounting scheme for non-consent wells, lacks the specificity necessary to directly benefit a third-party beneficiary to the Dominion–Moose Agreements. *See id.* at 591; *Brown v. Fullenweider,* 52 S.W.3d 169, 170 (Tex.2001) (per curiam) (holding that a decree of divorce was not a third-party beneficiary agreement in favor of one party's attorney because the decree did not name the attorney and merely allocated responsibility for the payment of his fees, along with other financial obligations, between the parties). As derived from our analysis of the unambiguous language of the Dominion–Moose Agreements in light of both oil and gas industry standards and customs and Texas case law, we conclude that Dominion and Moose clearly intended to allocate responsibility for the payment of many categories of expenses in the context of drilling non-consent wells. Accordingly, any benefit Barnes derived by way of the JOA Royalty Provision was merely incidental and not enough to entitle her to the third-party

beneficiary status she seeks. Therefore, Barnes may not enforce the Dominion–Moose Agreements under this theory of recovery.

### B. Privity of Estate

██ Relying on our opinion in *Amco Trust, Inc. v. Naylor,* 159 Tex. 146, 317 S.W.2d 47 (1958), Barnes next asserts that she and Tawes share privity of estate due to Tawes's assumption, as a consenting party, of Dominion's obligation to pay the royalties owed to her pursuant to the Barnes lease. Barnes's reliance on *Amco Trust* is misplaced, however, and we conclude that she and Tawes are not in privity of estate by virtue of his assumption of Dominion's duty to pay her royalties under the JOA Royalty Provision.

██ "Liability to . . . [a] lessor for the payment of rent or the performance of other lease covenants may arise from either privity of contract or privity of estate." *Id.* at 50. Privity of estate arises between an assignee of a lessee's entire interest in a lease and the original lessor. *Id.* An assignment creating privity of estate occurs when a lessee executes an instrument conveying his entire estate and interest under a lease to a subsequent lessee so that the original lessee retains no reversionary interest in the lease whatsoever. *See Westland Oil Dev. Corp. v. Gulf Oil Corp.,* 637 S.W.2d 903, 905, 910–11 (Tex.1982) (concluding that privity of estate existed between two parties by virtue of their "area of mutual interest agreement" which was "in the nature of a contract to convey interests in oil and gas leases"); *Davis v. Vidal,* 105 Tex. 444, 151 S.W. 290, 292 (1912) ("[T]he general rule as to what constitutes an assignment of a lease as distinguished from a sublease . . . is that the instrument must convey the whole term, leaving no interest or reversionary interest in the grantor."). The

payment of royalties on production to a lessor is a covenant running with lands covered by an oil and gas lease. *See Lone Star Gas Co. v. Mexia Oil and Gas, Inc.,* 833 S.W.2d 199, 202 (Tex.App.-Dallas 1992, no writ) ("Privity of estate is the foundation of the assignee's liability on covenants that run with the land."); 3 SUMMERS OIL AND GAS LAW § 29:7, at 529 (3d ed. 2008) ("An oil and gas lessee does not escape his duties to perform the covenant[ ] of [paying royalties owed under] the lease by assignment, even though the assignee may also incur the duty of [its] performance, for the lessee is bound by virtue of his contract with the lessor."). Therefore, when privity of estate exists between an assignee of an oil and gas lessee's entire leasehold interest and the original oil and gas lessor, the assignee must pay the lessor's royalties as required by the oil and gas lease. *See* 3 SUMMERS OIL AND GAS LAW § 29:7, at 529 (3d ed. 2008).

As noted above, in the oil and gas industry, JOAs are used for the primary purpose of allocating costs and revenues from production amongst the parties to the agreement, not to permanently transfer ownership interests in pooled oil and gas leases. *See Seagull,* 207 S.W.3d at 344 n. 1; *see also* J. David Heaney, *The Joint Operating Agreement, the AFE and CO-PAS—What They Fail to Provide,* 29 ROCKY MTN. MIN. L. INST. 743, 748–49 (1989) (discussing the frequently overlooked and unanticipated effect of operating agreements as documents of title). Here, the JOA signed by Dominion, Moose, and the Moose Assignees, including Tawes, is no different. Article III.B of the JOA specifically states, "Nothing contained in this [contract] shall be deemed an assignment or cross-assignment of interests covered hereby." Moreover, the JOA provides a method for calculating the duration of time consenting parties may temporarily own

non-consenting parties' interests in the well. Thus, the period of time during which the JOA grants consenting parties temporary ownership of non-consenting parties' share of production (in return for payment of royalties to the non-consenting parties' lessors) is limited. Upon the expiration of this specified period of temporary ownership, the JOA contemplates that ownership of the working interest in the non-consent wells reverts back to the nonconsenting parties. Therefore, the terms of the Dominion–Moose Agreements make clear that by opting to go non-consent as to the Baker–Barnes Wells No. 1 and No. 2, Dominion did not assign its interest as Barnes's lessee to Tawes or any other consenting party. Rather, Dominion retained a reversionary interest in the nonconsent wells. Because Tawes, as a consenting party, received no permanent interest in the Barnes Lease, privity of estate does not exist between Barnes and Tawes. *See Amco Trust*, 317 S.W.2d at 50; *Davis*, 151 S.W. at 292 (determining that a lessee who reserved to itself the ability to pay rent to its lessor in the event its subsequent lessee failed to do so retained a sufficient interest in the lease so that only a sublease occurred, not an assignment).

Barnes looks past the JOA's disclaimer of assignments and insists that privity of estate arose when Tawes consented to the drilling of the Baker–Barnes Wells No. 1 and No. 2 and assumed the duty, previously held by Dominion, of paying the royalties accruing on production from those wells to Barnes. What Barnes appears to describe as a new theory of privity by assumption, we rather see as a convoluted restatement of privity of contract. Barnes relies on our statement in *Amco Trust* that a sublessee "is not liable to the lessor ... unless he assumes or otherwise binds himself to perform [some obligation]." 317 S.W.2d at 50. But Barnes takes this language out of context, because we were not discussing privity of estate, but describing how two parties may reestablish liability between themselves once their privity of contract is extinguished. *See id.* ("There is no privity of contract between the lessor and a sublessee, and the latter is not liable to the lessor on the covenants of the lease, unless he assumes or otherwise binds himself to perform the same."). This statement of law is unrelated to the creation of privity of estate between the two parties at issue here.

Barnes is not a signatory to either of the Dominion–Moose Agreements; therefore, privity of contract does not exist between her and Tawes. *See id.* (privity of contract exists between parties to a specific contract). Further, Tawes never specifically assumed Dominion's prior duty of paying Barnes the royalties accruing from production on the non-consent wells. *See Regency Advantage Ltd. P'ship v. Bingo Idea–Watauga, Inc.*, 936 S.W.2d 275, 278 (Tex. 1996) (per curiam); *Davis*, 151 S.W. at 294 (holding that a sublessee who agreed to pay a certain amount of rent on a certain date but did not obligate himself to pay that amount to the lessor directly, did not assume liability for the lessor's unpaid rents); *see also Lone Star Gas Co.*, 833 S.W.2d at 201 ("There must be some express promissory words, or words of 'assumption,' on the part of the assignee." (quoting 4a Corbin on Contracts § 906, at 632 n. 1 (1951))). It is this same lack of clear and unequivocal assumptive language that prevents Barnes from recovering her unpaid royalties as a third-party beneficiary to the Dominion–Moose Agreements. Where a theory of recovery based on third-party beneficiary status fails, so too must a privity of contract theory, no matter how artfully constructed. *See* 9 Corbin on Contracts § 47.6, at 142 (2007) ("If the assignee contracts with his assignor to dis-

charge the duties of the assignor to the third party, the third party is an intended beneficiary of that contract."); 13 WILLISTON ON CONTRACTS § 37:1, at 7 (4th ed. 2000) ("Over time, however, through legislation and judicial decision, the traditional common-law view [on needing privity to recover on a contract] was abandoned, and however achieved, an exception to the need for privity was developed through the doctrine of third party beneficiaries."). Because Tawes, as a consenting party, did not permanently acquire Dominion's interest in the non-consent wells, and because Tawes did not otherwise contractually assume a duty to pay royalties accruing on production from the nonconsent wells directly to Barnes, we hold that the parties do not share any privity which allows Barnes to enforce the Dominion–Moose Agreements to recover her unpaid royalties from Tawes.

### III. Conclusion

In response to the Fifth Circuit's first certified question, we conclude that Barnes has no right to enforce the Dominion–Moose Agreements as a third-party beneficiary or by way of privity of estate. Because Barnes cannot enforce the Agreements here and necessarily lacks a right of recovery against Tawes, it is immaterial whether Tawes would be jointly and severally liable for the unpaid royalties owed Barnes. We therefore do not address the remaining certified questions.

### APPENDIX

# APPENDIX

```
┌──────────────────┐ ┌──────────────────┐
│ Baker │ │ Barnes │
│ and Others │ │ (Lessor/Royalty │
│ (Lessors/Royalty │ │ Owner) │
│ Owners) │ │ │
└──────────────────┘ └──────────────────┘
 │ │
 ▼ ▼
 BAKER LEASE BARNES LEASE
 ▲ ▲
┌──────────────────┐ ┌──────────────────┐ ┌──────────────────┐
│ Moose (Lessee) │ │ Working Interest │ │ Dominion │
│ │ │ Unit Agreement │ │ (Successor to │
│ (Partial Assign- │◄│ And │►│ original lessee) │
│ ment of Baker │ │ Joint Operating │ │ │
│ Lease working │ │ Agreement │ │ │
│ interest to │ │ │ │ │
│ Moose Assignees,│ │ (created pooled │ │ │
│ including Tawes)│ │ Baker Unit) │ │ │
└──────────────────┘ └──────────────────┘ └──────────────────┘
 │
 ▼
```

Initial Well
**(David Baker No. 1)**
- Operator: Dominion
- Non-operators: Moose, Moose Assignees (including Tawes)
- All parties consent

Additional, Non-Consent Wells
**(Baker-Barnes No. 1 and No. 2)**

- Operator: Moose
- Non-operators: Moose Assignees (including Tawes)
- Consenting: Moose, Moose Assignees (including Tawes)
- Non-Consenting: Dominion

Tawes acquires all Moose working
interest at bankruptcy foreclosure sale