JONES, Circuit Judge,
dissenting:
With due respect to my colleagues in this complex case, I dissent. Delta has not shown a substantial likelihood of success on the merits, which is critical to receiving a preliminary injunction. The majority, in my view, make a critical analytical error: they do not rule on the dispositive issue, whether Delta is a third party beneficiary of the airport lease agreement (“Lease Agreement”) between the City and Southwest Airlines. I disagree with the district court’s interpretation, holding Delta to be a third party creditor beneficiary under Texas law.
I hope and trust that on remand, the district court will review the issues closely and assimilate all the relevant evidence before issuing its final judgment.
1. Why Delta’s standing to sue is outcome-determinative to this Declaratory Judgment-based preliminary injunction.
The district court misinterpreted Texas law and held that Delta is a “creditor beneficiary” of the Lease Agreement. This conclusion preceded the court’s interpretation of the Lease Agreement and allowed if to referee the competing positions of Delta and Southwest. On appeal, however, the majority decline to decide the threshold issue of Delta’s right to seek an interpretation of the Lease Agreement. According to the majority, there is a “live controversy” under the Declaratory Judgment Act between the City and Southwest no matter what Delta’s rights may be. This forbearance is an error.
From the standpoint of the Declaratory Judgment Act, this contract litigation is a three-legged stool. The dispute arose when Delta’s extended month to month sublease expired, and Delta threatened civil disobedience rather than cease its daily flights from Love Field. The City sued Southwest and Delta seeking declaratory relief interpreting the Lease Agreement to bind both airlines. Southwest then sued Delta, and Delta sued Southwest. If Delta is not a third party creditor beneficiary of the Lease Agreement, however, it has no claim for breach against the City or Southwest and certainly cannot claim “perpetual” rights under the Lease Agreement to Southwest’s preferential lease gates. Consequently, without an enforceable contract claim by Delta, there is no “live controver *292 sy” between the City and Southwest. Delta’s leg of the stool is gone.[1]
The remaining legs comprise the City and Southwest. But no adversarial dispute connects these legs. The City has repeatedly and consistently denied any legal claim against Southwest. The City simply wants judicial “clarification” of its Lease Agreement. If the district court had rejected Delta’s claim to third party creditor beneficiary status under the Lease Agreement, the court could not render an interpretation for the two non-opposing parties, the City and Southwest. The Declaratory Judgment Act only permits resolution of live controversies. A live controversy might arise if in the future course of performing the Lease Agreement, the City’s and Southwest’s interests were bound to collide. Venator Grp. Specialty, Inc. v. Matthew/Muniot Family, LLC., 322 F.3d 835, 838 (5th Cir. 2003). Because Delta is not a third party creditor beneficiary, this is not such a case. Under the Lease Agreement Section 4.06(F), there is no adversity between the City and Southwest until and unless (a) a “new entrant” seeks “accommodation;” (b) all present leaseholders at Love Field deny such accommodation; (c) the City tentatively selects one of the leaseholders to reach an accommodation; (d) the City fails to rescind such designation; and (e) the selected leaseholder then refuses to go through with the City’s order to accommodate. Steps (d) and (e) have not occurred here.
The City’s brief emphasizes its non-adversarial stance toward Southwest. The City offers no interpretation of the Lease Agreement in conflict with Southwest’s espoused positions. On the contrary, the City agrees with Southwest that Delta is not a third party beneficiary. The City also agrees with Southwest that even if Delta is legally entitled to an accommodation, Delta may not secure a “perpetual” accommodation. This patent failure of adversary testing of the Lease Agreement between the City and Southwest exposes that, unless Delta was entitled to enforce the Lease Agreement, the district court rendered an advisory opinion.
The district court’s opinion plausibly rests on the three-legged stool only because it first found that Delta was a third party beneficiary. As will be seen, I disagree with that conclusion and consequently disagree with the majority’s avoidance of the issue of Delta’s standing.
2. Delta is not a Third Party Beneficiary.
Texas law presumes that parties enter a contract for themselves alone. Consequently, it is also presumed that strangers to the contract have no rights under it and cannot sue to enforce it. Delta claims to be a third party creditor beneficiary of the Lease Agreement and thus outside the presumptions, and the district court agreed. The district court was in error.
To evaluate Delta’s claim, I consider the parties’ contractual arrangements, the court’s reasoning, arid how Texas law should have been applied.
a. The Contracts
The Lease Agreement does not expressly mention Delta, although it provides for applications by “new entrant” airlines to commence service from Love Field if a variety of conditions are fulfilled. For instance, the current holders of preferential gate leases may approve and sublease gates voluntarily to the new entrant. Alter *293 natively, the City may, if it does not “unduly interfere” with the current holders’ scheduled service, impose requirements upon the current holders to accommodate the new entrant.[2] If the new entrant is ultimately denied subleasing, however, the Lease Agreement affords no further redress.
The Lease Agreement does not stand alone. It was executed pursuant to the other arrangements that made possible the reform of the Wright Amendment, which prevented Southwest from flying out of Love Field to states non-contigubus to Texas. The Five Party Agreement among Southwest, American, the cities of Dallas and Fort Worth, and DFW Airport under-girded passage of the Wright Amendment Reform Act (‘WARA”). Five Party Agreement, Art. I, § 1. That Agreement expressly rejects creating third party beneficiary status for any non-party. Art. II, § 11. Delta is not a party and played no role in the Five Party Agreement. To achieve its goal of being freed from the flight limitations embodied in the Wright Amendment, Southwest agreed in the Five Party Agreement to reduce the Love Field gates permanently from 32 to 20 and to keep only a proportionate percentage of the remaining gates (16 at first). Southwest also essentially agreed not to fly from DFW, as any leasing of gates there would require a one-for-one reduction of its preferential lease gates at Love Field. While the Five Party Agreement contemplated the possibility of accommodation to “new entrant”, carriers at Love Field, it placed the onus on the City of Dallas either to facilitate voluntary arrangements with Love’s existing carriers or “to require the sharing of preferential lease gates, pursuant to Dallas’ existing lease agreements.” Five Party Agreement, Art. I, § 3.b.
Finally, the WARA statutorily acknowledges the inviolability of existing preferential gate leases under the Lease Agreement, in stating that the law
shall not be construed to require the City of Dallas ... to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity to new entrants or to create common use gates, unless such modification or elimination is implemented on a nationwide basis.
Wright Amendment Reform Act of 2006, PL 109-352, Oct. 13, 2006, 120 Stat 2011, § 5(e)(2)(B). This language clearly protects preferential gate holders and restricts accommodation of new entrants in the absence of nationwide reallocations.
The Five Party Agreement and the Lease Agreement are interdependent, and their status is enshrined in the WARA. Under each agreement and the statute, the rights of the contracting parties are protected, and the proscription of third party beneficiary status (or severe restriction on new entrant admissions) should be respected.
b. The District Court’s Reasoning
The district court equated Delta with a “new entrant” under the Lease Agreement and held that the Lease Agreement obligates Southwest to “accommodate” Delta in that capacity. City of Dallas v. Delta Air Lines et al., No. 3:15-cv-02069-K, 2015 WL 3901862 at *22-23 (N.D. Tex., Dallas June 17, 2015) (“The Lease Agreement language does not limit the parties’ accommodation obligation to an airline not *294 currently operating at Love Field ... The Court agrees with Delta’s proposed definition of ‘new entrant’. Although the Lease Agreement language is not artfully drafted, the Court finds ‘new entrant airline’ to mean any airline that is not a Signatory Airline in a Lease Agreement with the City and an airline needing space at Love Field to provide service.”). Southwest agreed, in Section 4.06(F) of the Lease Agreement, to accommodate a “requesting airline” at times that would not “unduly interfere” with Southwest’s schedule. According to the court, this “duty owed to Delta is a contractual obligation or some other legally enforceable commitment ...” and it is “clear and unequivocal that the City and the Signatory Airlines intended to directly benefit a ‘new entrant airline’ ... with this accommodation provision.” The court further concluded that Delta is a third party “creditor beneficiary” entitled to sue to enforce the agreement — not a mere “incidental beneficiary” under Texas law. As the court put it:
If the City and Southwest as parties to the Lease Agreement did not intend for a ‘new entrant airline’ to have the right to enforce this section, there would be no other way for the accommodation procedure to work and no remedy for the ‘new entrant airline’ should the City and/or Southwest not comply with their agreement.
City of Dallas v. Delta Air Lines et al., No. 3:15-cv-02069-K, 2015 WL 3901862 at *24 (N.D. Tex., Dallas June 17, 2015). Given the “obligations” of the Lease Agreement toward a “new entrant,” the court concluded, such new entrant must be able to sue. Id. at 23-24.
c. Texas Law
Contrary to the district court’s holding, Delta is not a third party beneficiary under Texas law. “Under Texas law, parties are presumed to be contracting for themselves only.” Fleetwood Enterprises, Inc. v. Gaskamp, 280 F.3d 1069, 1075 (5th Cir.), opinion supplemented on denial of reh’g, 303 F.3d 570 (5th Cir. 2002). The Texas Supreme Court has clearly stated that “[a] court will not create a third-party beneficiary contract by implication ... The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied.” MCI Telecommunications Corp. v. Texas Utilities Elec. Co., 995 S.W.2d 647, 651 (Tex. 1999). A third party may only sue to enforce a contract that it did not sign when “the parties to the contract entered the agreement with the clear and express intention of directly benefitting the third party.” Tawes v. Barnes, 340 S.W.3d 419, 425 (Tex. 2011). Third parties can recover on a contract made by other parties “only if the parties intended to secure a benefit to that third party, and only if the contracting parties entered into the contract directly for the third party’s bene it.” Stine v. Stewart, 80 S.W.3d 586, 589 (Tex. 2002) (emphases added). The court construes the entire agreement and gives effect to all of its provisions so that no provisions are rendered meaningless. Id. at 590.
Once a third party beneficiary status is established, it must next be determined what type of third party beneficiary relationship exists between the parties. The district court classified Delta as a third party “creditor” beneficiary with standing to enforce the Lease Agreement. Creditor beneficiaries, as opposed to incidental beneficiaries, may bring suit to enforce a contract. Allan v. Nersesova, 307 S.W.3d 564, 571 (Tex. App. 2010). A party is considered a creditor beneficiary when “performance will come to satisfy a duty or legally enforceable commitment owed by the promis-ee.” S. Texas Water Auth. v. Lomas, 223 S.W.3d 304, 306 (Tex. 2007). “[T]he focus is *295 on whether the contracting parties inténd-ed, at least in part, to discharge an obligation owed to the third party.” Stine, 80 S.W.3d at 591. But if the contract only confers an indirect or incidental benefit, a third party cannot sue to enforce the contract. Tawes, 340 S.W.3d at 425.
d. Critique of the District Court
Section 4.06(F) states that existing preferential gate leaseholders “agree” to accommodate a “new entrant” on “reasonable terms” where such accommodation will “not unduly interfere” with the leaseholder’s operating schedule “taking into consideration all the circumstances of such an accommodation agreement.” This language, full of contingencies, hardly offers certainty-to the new entrant. Moreover, if the existing preferential leaseholder fails to enter into a voluntary accommodation, the City steers any further decision-making process. Characterizing a “new entrant” as an intended creditor beneficiary of this provision misreads the Lease Agreement and violates the cardinal principles reaffirmed in Texas law. Third party beneficiary status is never to be implied. Here, the new entrant has no “rights” so clearly and fully spelled out as to enable a court to “enforce” the alleged obligation. That any “new entrant” may seek accommodation and potentially benefit from a gate sublease is a far cry from saying the disappointed entrant may force itself upon the contracting parties, much less obtain the “perpetual” sublease that the court preliminarily awarded Delta.
The court got off on the wrong foot in holding that “the duty owed to Delta is a contractual obligation or some other legally enforceable commitment under the contract.” This conclusion proves too much. The court essentially extracted one sentence from Section 4.06(F) and engaged in an overly narrow parsing of the term “unduly interfere.” Every third party beneficiary claim begins with the assertion that the contracting parties “intended” to confer benefits or status on the non-party. The analysis then turns on the extent to which the contract, read as a whole, has used the language of intentionality, described the beneficiary with sufficient precision, and specified the beneficiary’s status in a way that a court can enforce. The necessary careful analysis of the Lease Agreement was not undertaken here.
Read as a whole, Section 4.06(F) crafts an intricate mechanism for providing accommodations under some limited circumstances to new entrant applicants. A new entrant is required first to approach existing preferential gate lease holders for voluntary arrangements. Section 4.06(F)(2). Leaseholders are not required to succumb voluntarily, nor are their duties toward new entrants precisely spelled out. Instead, the leaseholder agrees to accommodate subject to “reasonable terms” that would not “unduly interfere” with the existing holder’s operating schedule “taking into consideration all the circumstances.” Section 4.06(F). To the extent this imposes an “agreement to agree” on the leaseholder, it is unenforceable in Texas law. Liberto v. D.F. Stauffer Biscuit Co., 441 F.3d 318, 323 (5th Cir. 2006) (“[W]here an agreement leaves essential terms open for future negotiations, it is not a binding contract but, rather, an unenforceable ‘agreement to agree.’ ”). As such, it is impossible to see how a third party beneficiary can claim a “contractual obligation or other legally enforceable duty” that directly contracting parties would not owe to each other.
In any event, if the new entrant exhausts its approach to existing leaseholders, the new entrant may approach the City, embarking on a contractually specified procedure whose course must be *296 largely determined by the City. Section 4.06(F)(2). The City “may select” one of the current leaseholders to accommodate the new entrant. Section 4.06(F)(3). Texas law holds the word “may” is ordinarily permissive, not mandatory. See GT Leach Builders v. Sapphire, 468 S.W.3d 502, 525 (Tex. 2015) (“[W]e find no basis on which to conclude that the parties intended the word ‘may’ to be mandatory rather than permissive in this context.”). Even if the City does so, however, the leaseholder may register its objection, Section 4.06(F)(3), and the City may rescind an order for accommodation. Section 4.06(F)(4). Through this point in the procedures, the new entrant never becomes legally entitled to receive accommodation. Only if the City finally requires one of the leaseholders to enter into an accommodation, might it be said that the new entrant’s rights have matured into a legally enforceable obligation.[3] Critically, however, even if the City requires an existing leaseholder to accommodate a new entrant, Section 4.06(F)(4), “[i]n case of.a conflict between schedules ... the [existing leaseholder] will have priority in use of its personnel and its Leased Premises.” Section 4.06(F)(4)(a).
A complete reading of Section 4.06(F) demonstrates that the district court inferred intended beneficiary status from one misdescribed sentence of the Lease Agreement while overlooking the contract’s crucial implementation process for accommodations. Texas law does not permit implication of creditor beneficiary status in this way.
Other deficiencies in the court’s interpretation of Section 4.06(F) undercut its third party beneficiary conclusion. First, the holding that Southwest’s operating schedule was not “unduly interfered with” is suspect' legally and factually. From a legal standpoint, this phrase acts in tandem with the remainder of the sentence allowing Southwest to insist on “reasonable terms” and “taking into consideration all the terms of such an accommodation agreement.” The court never mentions these important limitations on the “duty” to accommodate. Factually, the court adopted an unrealistic snapshot in time by awarding Delta a permanent accommodation based on precisely the point at which Southwest was adjusting its schedule to begin wholly new airline service from Love Field throughout the United States.- According to the WARA, Southwest remained constrained until October 13, 2014 to fly only to states adjacent to Texas (plus a couple others). WARA, § 2(b). Looking to the alleviation of that limit, Southwest had to evaluate changing market conditions nationwide, execute a publicity campaign, adjust its current and future schedules, and sell tickets well in advance in order to roll out the new service cost-effectively. That Southwest was undertaking plans to fully utilize its preferential lease gates from Love Field in the near future was widely known and anticipated. (After all, Southwest had fully utilized even more gates at Love Field before the Five Party Agreement came into existence.) Delta, in other words, exploited the single period when there might have been a gap in Southwest’s immediate but hardly final operating schedule. By ignoring the demands of Southwest’s business, which were created by the WARA timetable, the court failed to “take into consideration all the terms” such an accommodation would , impose upon Southwest. The effect of the court’s reasoning deprives Southwest, con *297 trary to the Lease Agreement, the Wright Amendment, and the Five Party Agreement, of the benefit of its preferential lease status.[4]
Finally, contrary to the district court’s reasoning, the accommodation provision is not rendered “superfluous” in the absence of a contractual “enforcement” mechanism. It is the parties’ contractual provisions, not the court’s post hoc sense of fairness, that determines the scope of third party beneficiary status under Texas law. An “accommodation” “agreement” as vague as the provisions embodied in Section 4.06(F) is simply not judicially enforceable. See KW Const. v. Stephens & Sons Concrete Contractors, Inc., 165 S.W.3d 874, 883 (Tex. App. 2005) (“If the terms are so vague that the court cannot determine what the parties intended or what terms to enforce, the contract is unenforceable.”). The “enforcement” here is in the hands of the City, hedged about with limits on existing leaseholders’ duty to accommodate and the City’s flexibility. As has been noted, the City bears the laboring oar to ensure that accommodations, if authorized by the Lease Agreement and “all the circumstances,” are effectuated. The City, while in agreement with Southwest that Delta is not a third party beneficiary, maintains independent interests in maximum utilization of Love Field. Moreover, to the extent the duty to accommodate may flow from federal law provisions, a matter not briefed or argued before this court, Delta had the ability to commence administrative proceedings before the relevant federal agency. Rather than signal the need for judicial intervention, Section 4.06(F) was structured to maintain flexibility in the complex business of assigning, allocating, and negotiating airport gate leases.
For all these reasons, it cannot be maintained that Delta, even if a “new entrant” under the Lease Agreement, acceded to “rights” (what rights?), much less to a “perpetual” sublease from Southwest at Love Field. The court no doubt acted with the best of intentions. This preliminary injunction, however, did not interpret so much as impose a status on Delta to enforce invented contract rights, completely bypassing the procedures and limits of Section 4.06(F).
I respectfully dissent.

. Whether Delta has other viable legal claims was not decided by the district court or this court. Those claims remain pending. Whether the resolution of any of those claims would necessarily put the City at odds with Southwest is beyond the scope of this appeal.

. Denominating Delta a "new entrant” for any purpose stretches language and reality, but no large point about this conundrum seems to have been made in the district court. Delta not only is the second largest airline in the world, but it also holds gates at DFW Airport. And the DOJ, in evaluating,the market for passenger airline services in the DFW metroplex area, has included DFW and Love Field as one functional market.

. I do not speculate on that possibility, however, because the Section 4.06(F) procedures never went so far here.

. Allowing this "new entrant” to exploit a clearly temporary hiatus in the leaseholder’s full use of its gates has two other adverse consequences. Any future “new entrant” can make use of temporary gaps in service to insist on its own accommodation, a result that could allow piecemeal nibbling away at the existing leaseholders’ rights. Second, this interpretation detracts from the City’s flexibility in determining when accommodations must be required, a flexibility clearly envisioned by the City's being provided access to monthly gate usage statistics from the leaseholders. Section 4.06(F). How the City chooses to use these statistics is eroded with a holding that temporary gaps in service must be filled with accommodation subleases.