# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-10051

CITY OF DALLAS,

> Plaintiff - Appellee

v.

DELTA AIR LINES, INCORPORATED,

> Defendant - Appellee

v.

SOUTHWEST AIRLINES COMPANY,

> Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before REAVLEY, DAVIS, and JONES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This case concerns the operation of Love Field, an airport owned by Plaintiff-Appellee the City of Dallas (the "City"), and leased in part to Defendant-Appellant Southwest Airlines Company ("Southwest"). The City filed a declaratory judgment action seeking a determination of whether it must order Southwest to accommodate Defendant-Appellee Delta Air Lines, Incorporated ("Delta"), at Love Field under the Lease Agreement or otherwise.

United States Court of Appeals
Fifth Circuit

**FILED**

February 2, 2017

Lyle W. Cayce
Clerk

No. 16-10051

Delta, Southwest, and the City filed competing motions for preliminary injunctions. Delta argued that (a) the Lease Agreement requires the City to order Southwest to accommodate Delta, and (b) Delta may sue to enforce the obligations because it is a third party beneficiary under the Lease Agreement. The court granted Delta's motion in full. It found that the City was also entitled to a preliminary injunction, in the alternative, for the same relief requested by Delta because the district court interpreted the Lease Agreement to require the City to accommodate Delta. Because it interpreted the Lease Agreement to require accommodation, the court necessarily denied Southwest's motion.

Southwest appealed, arguing that Delta is not a third party beneficiary and that the Lease Agreement does not require the accommodation Delta seeks. The City did not appeal, but in its appellee brief it argued that although Delta should be accommodated under the Lease Agreement, Delta is not entitled to sue as a third party creditor beneficiary. For the reasons set forth below, we affirm the district court's order granting the City's preliminary injunction,[1] granting Delta an accommodation until a final determination on the merits, and affirm the district court's denial of Southwest's preliminary injunction. Because Delta will effectively receive the relief it seeks under the City's preliminary injunction, we decline to address at this stage whether Delta is a third party creditor beneficiary.

---

[1] The district court twice stated in its opinion that it was granting the City's motion for a preliminary injunction but instead terminated the motion as moot, because it was already granting the same relief under Delta's preliminary injunction. *See* 2016 WL 98604 at *1 ("Because the equitable factors also weigh in favor of the City, the Court **GRANTS** the City's motion." (emphasis in original)) and *15 ("So, even if the Court did not to grant Delta's motion, the Court **grants** the City's motion for injunctive relief." (emphasis in original)); *compare id.* at *16 ("The Clerk of the Court is hereby **directed to terminate** the City's motion for preliminary injunction as moot." (emphasis in original)). The court's intent to grant the City's motion and enter a preliminary injunction directing it to accommodate Delta is clear, but affirming that portion of the court's order requires this court to vacate the district court's order terminating as moot the City's motion for a preliminary injunction and to render judgment in favor of the City.

2

No. 16-10051

## I.     Legal Context and Procedural History

Love Field is an airport owned by Plaintiff-Appellee the City of Dallas and is most closely associated with Southwest, which is by far its biggest user.[2] Love Field has always been subject to special legislation (beginning with the 1979 Wright Amendment) which historically permitted it to operate only in a very limited geographic region, in essence to protect the business of the Dallas-Ft. Worth International Airport ("DFW Airport"), which does not have those geographic restrictions.

In 2006, Congress suggested that the Cities of Dallas and Fort Worth reach a long-term compromise removing the Love Field flight restrictions. The City of Dallas, the City of Fort Worth, the DFW Airport Board, and the two airlines then operating at Love Field, Southwest and Defendant American Airlines, entered into the so-called Five Party Agreement on July 11, 2006. The district court summarized the agreement as follows:

> Important terms of the Five Party Agreement include the following:
>
> > 1. A reduction in the total number of gates at Love Field from 32 to 20.
> >
> > 2. A prohibition of the subdivision of a gate in any form, including the use of hardstands which permit an airline to "ground load/unload" their passengers.
> >
> > 3. The allocation of 16 "preferential use" gates to Southwest, two "preferential use" gates to American, and two "preferential use" gates to ExpressJet Airlines, Inc..
> >
> > 4. A limitation on flight operations to the hours of 6:00 a.m. to 11:00 p.m.

---

[2] *See generally City of Dallas v. Delta Airlines, Inc.*, No. 3:15-CV-2069-K, 2016 WL 98604, at *1-6 (N.D. Tex. Jan. 8, 2016). The facts in this section are taken from the district court's opinion unless otherwise noted.

No. 16-10051

> 5. A prohibition of international flights originating
> from Love Field.

In addition to these terms, the Five Party Agreement refers to the possibility of a new entrant airline seeking space to operate at Love Field under the new gate limitations:

> To the extent a new entrant carrier seeks to enter Love Field, the City of Dallas will seek voluntary accommodation from its existing carriers to accommodate the new entrant service. If the existing carriers are not able or are not willing to accommodate the new entrant service, then the City of Dallas agrees to require the sharing of preferential lease gates, pursuant to Dallas' existing lease agreements.[3]

Relevant to this dispute, Love Field allows a maximum of 10 flights per day per gate, for a maximum of 200 flights per day.

The district court found that the Five Party Agreement does not define the term "preferential use," but the individual Lease Agreements between the City and each airline (referred to in each Lease Agreement as a "Signatory Airline") defines "preferential use" to mean that the Signatory Airline is the "primary, but not the sole, user."[4]

> After the Five Party Agreement was formalized, the parties presented their agreement to Congress as the collaborative local effort for reforming and/or repealing the Wright Amendment. Several, though not all, provisions of the Five Party Agreement were ultimately incorporated into the Wright Amendment Reform Act ("WARA"), which officially repealed the Wright Amendment when it was adopted on October 13, 2006; but maintained the long-distance flight restrictions from Love Field for eight more years until October 2014. Just as in the Five Party Agreement, WARA addressed new entrant airlines needing space to operate at the now gate restricted Love Field, specifically providing that, "[t]o

---

[3] *Id.* at *2.

[4] *Id.*; *see also* Amended and Restated Lease of Terminal Building Premises (Airport Use and Lease Agreement) by and between City of Dallas and Southwest Airlines Co. (hereinafter simply "Lease Agreement") at Section 1.46 (defining "Preferential Use Space").

accommodate new entrant air carriers, the city of Dallas shall honor the *scarce resource provision* of the existing Love Field leases." (Emphasis added.) The substantive provisions regulating flights in and out of Love Field were incorporated into WARA. The provisions of the Five Party Agreement which were not incorporated into and adopted by WARA are simply contractual obligations between the five parties that are independent of WARA, and do not include Delta.[5]

In addition, Article I.12 of the Five Party Agreement requires the parties to amend the underlying Lease Agreements and "take such actions, as necessary or appropriate, to implement" the Five Party Agreement. Article II.11 (titled "NO THIRD PARTY BENEFICIARIES") states that the Five Party Agreement is intended only for the benefit of the parties thereto and is not intended to create any third party beneficiary relationship with anyone.

Thus, the Five Party Agreement facially requires the City and Southwest to accommodate a "new entrant air carrier," but it expressly disavows the creation of any third party beneficiary status and leaves the implementation of those obligations to the amendment of the Lease Agreement between Southwest and the City. That Lease Agreement, as amended, sits at the core of this dispute. The district court summarized the relevant terms as follows:

> The terms of each Lease Agreement for gates between the City and the respective Signatory Airline are essentially identical, according to the City. The Signatory Airline has either exclusive use or preferential use of its leased space at Love Field, as described in the Lease Agreements. "Exclusive use" pertains to that leased space that the Signatory Airline has the sole right to use. "Preferential use", on the other hand, applies to those leased spaces where the Signatory Airline is considered the primary, but not sole, user. Under each Lease Agreement, no Signatory Airline has exclusive use of any gate, only preferential use. There is exclusive use leased space at Love Field; but, there are no exclusive use gates at Love Field.

---

[5] 2016 WL 98604, at *2.

No. 16-10051

Just as both the Five Party Agreement and WARA recognized the limitations created by the gate restrictions, each Lease Agreement addresses the possibility of Love Field facilities becoming a "scarce resource". The Lease Agreement anticipates a new entrant air carrier ("Requesting Airline") may seek to provide service at Love Field with the new gate restrictions. Recognizing the need for "open access and uniform treatment", the Lease Agreement goes further and provides a procedure in Section 4.06F when accommodation is sought by a Requesting Airline. This procedure requires the Requesting Airline first exhaust all reasonable efforts to secure a *voluntary* arrangement for accommodations from each Signatory Airline. If the Requesting Airline's attempt for voluntary accommodation fails, then the City's Director of Aviation ("Director") will notify each Signatory Airline that if a voluntary accommodation is not made within the 30-day time frame under each Lease Agreement, the Director will select one of the Signatory Airlines to fulfill the accommodation request. Notice will then be sent to the selected Signatory Airline which will have 10 days to comment on or dispute the Director's choice. The Signatory Airline must accommodate the Requesting Airline unless the Director rescinds his selection. The accommodation procedure does not specify options or remedies the Requesting Airline might have if the Director rescinds his selection.[6]

Finally, Section 14.33 of the Lease Agreement contains an "entire agreement" clause, providing that the Lease Agreement itself "constitutes the entire agreement" which may not be changed without a written instrument.

As the district court noted, some post-WARA developments at Love Field resulted in Southwest having a lease for preferential use of 16 gates, Defendant United Airlines, Inc. having a lease (as successor to ExpressJet Airlines, Inc.) for preferential use of two gates, and Defendant Virgin America, Inc. having a preferential use of two gates as a result of the merger of American with U.S. Airways. The Department of Justice previously held that Virgin's gates cannot go to either Southwest or Delta.

---

[6] 2016 WL 98604, at *3 (emphasis in original).

We now turn to the actual dispute: Delta was not a Signatory Airline because it did not have a Lease Agreement with the City.[7] It entered into a month-to-month sublease with American beginning in July 2009, but that lease was set to end on October 12, 2014. As contemplated by the Lease Agreement, Delta, as a Requesting Airline, sought to remain at Love Field through a voluntary accommodation, which it requested from the Signatory Airlines on June 13, 2014.

Delta was unable to obtain a voluntary accommodation, so it requested a mandatory accommodation from the City in a letter dated July 16, 2014. The City selected United to accommodate Delta because United was only using seven flights daily out of its two leased gates, which left 13 flights per day still available under Love Field's 10 flights per gate policy. In the meantime, Southwest first acquired use of United's gates through a gate usage agreement with United and later bought the gates for $120 million in late 2014, leaving Southwest with 18 gates and Virgin with two. Based on Southwest's purchase of United's gates, the City rescinded its accommodation decision and notified Delta on September 29, 2014 that it could no longer be accommodated.

The Lease Agreement provides no remedy for a Requesting Airline in the event the City rescinds its accommodation selection, but Delta again requested accommodation. The City initiated a second accommodation request on December 1, 2014, and sent a letter to Virgin, United, and Southwest, stating that Delta's request had triggered the accommodation process set out in Section 4.06F of the Lease Agreement and that the City would choose an airline to accommodate Delta if they could not choose among themselves. The airlines failed to voluntarily accommodate Delta, and the City never made a mandatory accommodation decision.

---

[7] For more information on the accommodation requests, *see generally id.* at *3-5.

No. 16-10051

The City twice asked the Department of Transportation ("DOT") for advice on how to handle the situation. The DOT opined that the City had a legal obligation to accommodate Delta, but the DOT's opinions do not appear to constitute a final agency action. The City never made a decision on its own, and none of the airlines agreed to voluntarily accommodate Delta.[8]

Delta continued to operate five flights per day out of Love Field under its temporary gate usage agreement with United which was set to expire after 180 days, on July 6, 2015. When Southwest acquired United's gates, it offered to honor United's temporary agreement with Delta for five daily flights until July 6. Southwest refused to extend that date.

> Continuing to press the accommodation request with the City, Delta told the City it would refuse to cease operations at Love Field on July 7, 2015, because it had a right to accommodation. In an attempt to avoid what it says would be potential chaos at Love Field beginning July 7, 2015, the City filed this lawsuit on June 17, 2015, seeking declaratory relief related to, among other things, its legal obligations and rights with respect to the Five Party Agreement, WARA, the Lease Agreements and federal regulations and laws affecting Love Field; essentially the City is asking this Court to "Please tell us what to do."[9]

The district court convinced the parties to enter into a temporary agreement preserving the status quo at Love Field until it could address the dispute. Under this temporary agreement, Southwest continued allowing Delta to operate five daily flights out of Love Field.[10]

The parties then filed competing motions for preliminary injunctions. Delta sought injunctive relief against Southwest to preserve the status quo (i.e., five daily flights) pending final resolution of the declaratory judgment action. Southwest sought injunctive relief against Delta prohibiting Delta from

---

[8] *Id.* at *6.

[9] *Id.*

[10] 2016 WL 98604, at *6.

No. 16-10051

trespassing on Southwest's gates at Love Field once the temporary gate usage agreement terminated, on the ground that Southwest is not required to accommodate Delta under the Lease Agreement. The City requested, in the alternative, that the district court grant the relief requested by either Delta, the relief requested by Southwest, or any other appropriate relief.

The district court correctly set out the framework for determining whether to grant a preliminary injunction as follows:

> The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits. To be entitled to a preliminary injunction, the movant must satisfy each of the following equitable factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest. Because a preliminary injunction is an extraordinary remedy, it should not be granted unless the movant has clearly carried the burden of persuasion' on all four requirements. Failure to sufficiently establish any one of the four factors requires this Court to deny the movant's request for a preliminary injunction. Any factual findings and/or conclusions of law the Court makes herein are not binding at a trial on the merits.[11]

The district court granted a preliminary injunction in favor of Delta and against Southwest because it found that, in addition to demonstrating the other three requirements for a preliminary injunction, Delta had also shown a substantial likelihood of success on the merits regarding (a) its ability to sue as a third party creditor beneficiary under the Lease Agreement and (b) its claim that the Lease Agreement required Delta to be accommodated. The district court also found that the City, as a party to the Lease Agreement, was independently entitled to its alternative request for injunctive relief requiring

---

[11] *Id.* at *6 (N.D. Tex. Jan. 8, 2016) (citations and internal quotation marks omitted).

No. 16-10051

Delta to be accommodated under the court's interpretation of the contract. Based on its interpretation of the Lease Agreement, the court necessarily concluded that Southwest failed to show a substantial likelihood of success on the merits.

Accordingly, the district court denied Southwest's motion and entered a preliminary injunction in favor of Delta essentially permitting Delta to continue operating five flights daily until a final decision on the merits. Southwest timely appealed.

## II.    Jurisdiction and Standard of Review

The district court had subject matter jurisdiction under 28 U.S.C. § 1331, 1332, and 1367. We have jurisdiction over this timely appeal of the district court's denial of a preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1).

We review the district court's ultimate decision to grant or deny a preliminary injunction for abuse of discretion, but we review "a decision grounded in erroneous legal principles" de novo.[12]

## III.    Analysis

On appeal, Southwest argues that it is entitled to a preliminary injunction because the Lease Agreement does not require accommodation. It also argues that, at any rate, Delta may not sue because it is not a third party beneficiary under the Lease Agreement. Delta defends the district court's opinion in full. The City argues that the district court's interpretation of the Lease Agreement requiring accommodation is correct, but Delta is not a third party beneficiary under the Lease Agreement and should not be able to sue as a non-party.

---

[12] *Speaks v. Kruse*, 445 F.3d 396, 399 (5th Cir. 2006) (quoting *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001)); *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citing *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)).

No. 16-10051

The parties argue a great deal over the question of whether Delta, a non-party to the Lease Agreement, is a third party creditor beneficiary entitled to sue on its own right, but we conclude that we need not resolve this question at the preliminary injunction stage. That is because the parties to the Lease Agreement, Delta and the City (at least in the alternative), have sought preliminary injunctions based on competing interpretations of the contract. The interpretations are mutually exclusive, as is the relief available. Either the Lease Agreement requires accommodation or it does not. Either Delta must be accommodated in the meantime at the status quo of five daily flights out of Love Field or it must not be.

If the interpretation requiring accommodation prevails, Delta will continue to enjoy a temporary accommodation under the City's preliminary injunction, regardless of whether Delta is a third party beneficiary entitled to sue in its own right. On the other hand, if Southwest's interpretation is correct and the Lease Agreement does not require accommodation, then Delta's status as third party beneficiary could not help it. Accordingly, we decline to reach the third party beneficiary status question and instead address only the question of whether the Lease Agreement requires accommodation.

Southwest does not challenge the district court's findings on three of the four preliminary injunction requirements as to either Delta or the City. Southwest challenges only the first requirement, whether Delta and the City demonstrated a substantial likelihood of success on the merits. The district court summarized the standard as follows:

> In establishing a "substantial likelihood of success", the movant "is not required to prove [his] entitlement to summary judgment" for purposes of preliminary injunction. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009); *see also Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011). The district court "look[s] to 'standards provided by the substantive law'" to determine likelihood of

11

No. 16-10051

success on the merits. *Janvey*, 647 F.3d at 596 (quoting *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)).[13]

Delta asserted four different claims, but the district court only addressed its claims against Southwest for breach of contract and declaratory judgment based on the Lease Agreement.[14] Under Texas law, a party asserting breach of contract

> must prove: (1) the existence of a valid contract; (2) that the [party] performed or tendered performance; (3) that the other party breached the contract; and (4) that the party was damaged as a result of the breach. *Cordero v. Avon Products., Inc.*, No. 15-40563, 2015 WL 6530721, at *2 (5th Cir. Oct. 29, 2015). A party must establish its privity to the contract or its status as a third-party beneficiary in order to sue for breach of contract. *Maddox v. Vantage Energy, LLC*, 361 S.W.3d 752, 756-57 (Tex.App.—Ft. Worth 2012).[15]

The City's own motion for a preliminary injunction is a bit broader than a breach of contract claim, in that the City seeks not just a narrow determination of whether Southwest breached the Lease Agreement but a general determination of its own rights and obligations under the Lease Agreement, the Five Party Agreement, the WARA, and other applicable rules.[16] In essence, the City simply wants to know what it is required to do. Though there are theoretical differences between Delta's arguments and the City's, there are no practical differences at this stage. The interpretation of the Lease Agreement resolves the preliminary injunction inquiry.

On the merits of Delta's claim that Southwest breached the Lease Agreement by failing to accommodate it as required under Section 4.06F, the court noted that Texas law requires Delta to prove: "(1) the existence of a valid

---

[13] 2016 WL 98604, at *7.

[14] *Id.*

[15] *Id.*

[16] *Id.* at *14.

12

contract; (2) that Delta performed or tendered performance; (3) that Southwest breached the contract; and (4) that Delta was damaged as a result of the breach."[17] The court noted that the contract was valid, and it held that the second factor was met because

> the record establishes that Delta performed its obligation under the accommodation procedure in section 4.06F by contacting all Signatory Airlines and any airline subleasing gate space from a Signatory Airline beginning June 13, 2014, to try to secure voluntary accommodation.[18]

The court also held that Delta suffered harm from the alleged breach because it would no longer be able to operate at Love Field at all if Southwest refused to honor its accommodation obligations under the Lease Agreement.[19] The biggest question, of course, is whether Southwest breached the Lease Agreement at all.

The court focused on the fact that Section 4.06F provides that the Signatory Airline (here Southwest) "agrees to accommodate such Requesting Airline at its Lease Premises at such times that will not unduly interfere with its operating schedule" but does not define the phrase "unduly interfere with."[20] The court started with the legislative history:

> The Court finds it very interesting that former Mayor Laura Miller testified about this exact phrase in the Lease Agreement at the Congressional subcommittee hearing on reforming the Wright Amendment Act. In response to a subcommittee member's question about the meaning of the undefined and "vague" term "unduly interfere with", Ms. Miller testified:
>
> > Well it was crafted by the Dallas City Attorney's Office and we understand, since it has never been tested, we have never had a conflict; that *we should, if we are*

---

[17] *Id.* at *9 (citation omitted).
[18] *Id.*
[19] *Id.* at *12.
[20] *Id.* at *10.

*responsible, create a very clear policy using this as the template for how we are in real terms going to be executing this.* This [term] gives us the authority to tell [a Signatory Airline], you have to make room. But I think that like other airports like you cited that have this issue of capacity, *we need to have a very clear policy in place so that the tenants have a clear expectation for how it's going to work when the director say we shall make room for [a Requesting Airline] and this is how we are going to do it.*

Ex. 631, p. 0052. As we now know, the City wholly failed to craft any policy, let alone a clear one, setting forth how the accommodation procedure and process would work in reality. This "vague language about 'unduly interfere with'" was drafted by the City itself and was noted by at least one concerned subcommittee member of contributing to "Southwest [being] in the catbird seat". And worse, then Mayor Laura Miller acknowledged the need for the City, "*if we are responsible, [to] create a very clear policy...for how we are in real terms going to be executing this.*" Now in this case, the Court is asked to follow through with what the City should have done years ago.[21]

The district court viewed the problem before it as one of supplying a reasonable interpretation of vague or undefined contractual language, which in turn required examining the particular facts of Southwest's usage and Southwest's own past interpretation of that language. The court held that the question of whether an accommodation would "unduly interfere with" a Signatory Airline's operations must be examined at the time the accommodation request is made:

The Court concludes, for purposes of this preliminary injunction, that "unduly interfere with" in section 4.06F means the requested flight accommodation can fit within the Signatory Airline's existing published schedule, at the time the accommodation request is made, without causing the Signatory Airline's existing schedule to reach maximum usage. The evidence establishes that

---

[21] 2016 WL 98604 at *10 (emphasis in original).

No. 16-10051

Southwest considers maximum usage or "full utilization" of gates at Love Field to be 10 flights daily per gate. The Court finds Delta provided evidence that, at several points in time after its initial accommodation request in June 2014, Southwest was able to accommodate Delta's five daily flights on Southwest's 16 gates without unduly interfering with Southwest's existing operating schedule.[22]

The district court set out, in detail, how Southwest had plenty of room in its schedule to accommodate Delta's five flights daily when Delta made its first request in June 2014.[23] As the district court noted, Southwest did not even announce its intention to operate at full capacity (10 flights per gate per day) until February 26, 2015, and it did not reach full capacity until August 9, 2015.[24] Thus, the court concluded that Southwest could have voluntarily accommodated Delta's five daily flights without "unduly interfering with" Southwest's schedule at any point prior to August 9, 2015.[25] Beyond the obvious capacity to voluntarily accommodate, the district court pointed out that Southwest's Lease Agreement was for preferential, not exclusive, use, and Southwest could not obtain exclusive use simply by maximizing its own utilization following an accommodation request:

Under the Lease Agreement, preferential use of airport facilities means the Signatory Airline is the primary, but not sole, user. Exclusive use means the airline has the sole right to use the space. There are no exclusive use gates at Love Field. Southwest has preferential use of the gates it leases from the City and subleases from United. Therefore, Southwest is considered to be the primary, but not sole, user of the gates. Southwest does not have an unfettered right to the gates it has leased; and, despite Southwest's argument to the contrary, the preferential use rights are subject to the accommodation provision contained in the Lease Agreement, which Southwest agreed to and signed. Southwest's position is that

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.* at *11.

15

accommodation is not required as long as they are using the gates at full utilization of 10 flights daily out of each gate. Southwest did not "fully utilize" its gate space until, at the earliest, its announcement on February 26, 2015 of increased flight operations, or, at the latest, until August 2015 when the actual increase was fully realized. Southwest cannot "ramp up" its flight schedule to thwart the pending accommodation request by Delta.[26]

The district court noted that when the WARA was being debated before Congress, Southwest's CEO at the time, Herb Kelleher, had testified that "'[A]ny carrier that is desirous now of serving Love Field can easily be accommodated even after those [12] gates come down,' limiting Love Field to 20 gates."[27] Mr. Kelleher testified that the City would simply tell Southwest, "you have got these vacant spaces in your gate utilization and by golly you are going to put another carrier in there."[28] The district court summarized:

> Southwest agreed in Section 4.06F that it would accommodate a "new entrant airline" when accommodation would not "unduly interfere" with its own operating schedule. As the Court has found, Southwest's schedule would clearly accommodate Delta when it made its initial request for voluntary accommodation in accordance with Section 4.06F, and for several months after. Delta has established Southwest did not comply with its contractual obligation and, therefore, breached Section 4.06F, the accommodation provision, of the Lease Agreement.[29]

In sum, the court found that the Lease Agreement required Southwest to accommodate a new entrant airline such as Delta, and that Southwest had the capacity to accommodate Delta easily at the time Delta requested the accommodation, which is when the City should have granted the mandatory accommodation. Thus, the court concluded that Southwest could not escape its

---

[26] *Id.*

[27] 2016 WL 98604 at *11 (quoting congressional testimony)

[28] *Id.*

[29] *Id.*

accommodation obligation merely by increasing its schedule to full utilization after the fact to shut Delta out. Rather, it was required to accommodate Delta's five flights daily *and* maintain that accommodation indefinitely under the court's interpretation of the "unduly interfere with" language of Section 4.06F.

We agree with the district court that Delta and the City have shown a substantial likelihood of success on the merits on the claim that the Lease Agreement requires Delta to be accommodated. The Lease Agreement plainly establishes a duty to accommodate by both Southwest and the City, and the scope of that duty is determined largely through the interpretation of language which the Lease Agreement itself leaves undefined. The district court, interpreting that language for the first time, found that Southwest owed the duty to accommodate Delta under these circumstances, effective when Delta *should have* received a mandatory accommodation. We find the district court's reasoning to be persuasive under these facts.

We are not persuaded by Southwest's arguments, which largely depend on a contrary interpretation of the Lease Agreement's undefined language. For instance, Southwest argues that Delta's usage would "unduly interfere with" Southwest's operating schedule, especially after Southwest reached full utilization, but the district court explicitly considered and rejected those arguments under its own interpretation of the contractual language, with which we agree at this stage.

Southwest raises no persuasive arguments against the district court's interpretation. The crux of Southwest's position is that its preferential use lease essentially entitles it to *exclusive* use of the gate once it reaches full utilization. One problem for Southwest is that the language of the Lease Agreement itself suggests that even an exclusive use lease might be subject to accommodation, in that the "scarce resource" clause in Section 4.06F refers to

"exclusive or preferential use" in connection with the accommodation obligation.

Next, Southwest argues that Section 4.06F is not even triggered unless and until the City ordered Southwest to accommodate Delta, which never happened because the City failed to act. The problem is that the City filed this suit seeking a determination of its own obligations under the Lease Agreement, among other things, and the district court found that the City was required to accommodate Delta. The City sought appropriate injunctive relief, including an accommodation of Delta if that is required under the Lease Agreement. Under the district court's interpretation of the Lease Agreement, which we adopt at this stage, accommodation is required.

In short, Southwest has not challenged three of the preliminary injunction factors, only whether the City (and Delta, by extension) has shown a substantial likelihood of success on the merits on its claim that the Lease Agreement requires Delta's accommodation. The district court, examining the Lease Agreement carefully, concluded that the contract's plain language and the court's interpretation of undefined terms (especially the meaning of "unduly interfere with") combined to show that the City had shown a substantial likelihood of success on the merits.

We find the district court's interpretation reasonable, and we agree that the City has shown a substantial likelihood of success on the merits. Accordingly, we affirm the court's grant of the City's motion for a preliminary injunction, preserving the status quo and allowing Delta to continue to operate five daily flights out of Love Field. Because Delta will receive the relief it requests under the City's preliminary injunction, we decline to reach the issue of Delta's motion for a preliminary injunction, which would require a determination of Delta's third party beneficiary status.

Because we affirm the district court's grant of the City's motion for a preliminary injunction, we necessarily affirm the district court's denial of Southwest's motion for a preliminary injunction.

## IV. Conclusion

As noted above, in the district court's memorandum opinion and order, it twice stated that it was granting the City's motion for a preliminary injunction but technically terminated the City's motion as moot, because it was granting the same relief under Delta's preliminary injunction. The effect of this opinion is to grant the City's motion and give interim relief to Delta. For the reasons set out above, we VACATE the district court's order terminating the City's motion as moot and, consistent with the district court's opinion, RENDER judgment granting the City's motion for a preliminary injunction and ordering the accommodation of Delta until a judgment on the merits is reached. We also AFFIRM the district court's denial of a preliminary injunction in favor of Southwest. Because Delta will receive an accommodation under the City's preliminary injunction, we decline to address, as moot, the district court's grant of Delta's motion for a preliminary injunction.

19

No. 16-10051

JONES, Circuit Judge, dissenting:

With due respect to my colleagues in this complex case, I dissent. Delta has not shown a substantial likelihood of success on the merits, which is critical to receiving a preliminary injunction. The majority, in my view, make a critical analytical error: they do not rule on the dispositive issue, whether Delta is a third party beneficiary of the airport lease agreement ("Lease Agreement") between the City and Southwest Airlines. I disagree with the district court's interpretation, holding Delta to be a third party creditor beneficiary under Texas law.

I hope and trust that on remand, the district court will review the issues closely and assimilate all the relevant evidence before issuing its final judgment.

## 1. Why Delta's standing to sue is outcome-determinative to this Declaratory Judgment-based preliminary injunction.

The district court misinterpreted Texas law and held that Delta is a "creditor beneficiary" of the Lease Agreement. This conclusion preceded the court's interpretation of the Lease Agreement and allowed it to referee the competing positions of Delta and Southwest. On appeal, however, the majority decline to decide the threshold issue of Delta's right to seek an interpretation of the Lease Agreement. According to the majority, there is a "live controversy" under the Declaratory Judgment Act between the City and Southwest no matter what Delta's rights may be. This forbearance is an error.

From the standpoint of the Declaratory Judgment Act, this contract litigation is a three-legged stool. The dispute arose when Delta's extended month to month sublease expired, and Delta threatened civil disobedience rather than cease its daily flights from Love Field. The City sued Southwest and Delta seeking declaratory relief interpreting the Lease Agreement to bind

No. 16-10051

both airlines.  Southwest then sued Delta, and Delta sued Southwest.  If Delta is not a third party creditor beneficiary of the Lease Agreement, however, it has no claim for breach against the City or Southwest and certainly cannot claim "perpetual" rights under the Lease Agreement to Southwest's preferential lease gates.  Consequently, without an enforceable contract claim by Delta, there is no "live controversy" between the City and Southwest.  Delta's leg of the stool is gone.[1]

The remaining legs comprise the City and Southwest.  But no adversarial dispute connects these legs.  The City has repeatedly and consistently denied any legal claim against Southwest.  The City simply wants judicial "clarification" of its Lease Agreement.  If the district court had rejected Delta's claim to third party creditor beneficiary status under the Lease Agreement, the court could not render an interpretation for the two non-opposing parties, the City and Southwest.  The Declaratory Judgment Act only permits resolution of live controversies.  A live controversy might arise if in the future course of performing the Lease Agreement, the City's and Southwest's interests were bound to collide. *Venator Grp. Specialty, Inc. v. Matthew/Muniot Family, LLC.*, 322 F.3d 835, 838 (5th Cir. 2003).  Because Delta is not a third party creditor beneficiary, this is not such a case.  Under the Lease Agreement Section 4.06(F), there is no adversity between the City and Southwest until and unless (a) a "new entrant" seeks "accommodation;" (b) all present leaseholders at Love Field deny such accommodation; (c) the City tentatively selects one of the leaseholders to reach an accommodation; (d) the City fails to rescind such designation; and (e) the selected leaseholder

---

[1] Whether Delta has other viable legal claims was not decided by the district court or this court.  Those claims remain pending.  Whether the resolution of any of those claims would necessarily put the City at odds with Southwest is beyond the scope of this appeal.

then refuses to go through with the City's order to accommodate. Steps (d) and (e) have not occurred here.

The City's brief emphasizes its non-adversarial stance toward Southwest. The City offers no interpretation of the Lease Agreement in conflict with Southwest's espoused positions. On the contrary, the City agrees with Southwest that Delta is not a third party beneficiary. The City also agrees with Southwest that even if Delta is legally entitled to an accommodation, Delta may not secure a "perpetual" accommodation. This patent failure of adversary testing of the Lease Agreement between the City and Southwest exposes that, unless Delta was entitled to enforce the Lease Agreement, the district court rendered an advisory opinion.

The district court's opinion plausibly rests on the three-legged stool only because it first found that Delta was a third party beneficiary. As will be seen, I disagree with that conclusion and consequently disagree with the majority's avoidance of the issue of Delta's standing.

## 2. Delta is not a Third Party Beneficiary

Texas law presumes that parties enter a contract for themselves alone. Consequently, it is also presumed that strangers to the contract have no rights under it and cannot sue to enforce it. Delta claims to be a third party creditor beneficiary of the Lease Agreement and thus outside the presumptions, and the district court agreed. The district court was in error.

To evaluate Delta's claim, I consider the parties' contractual arrangements, the court's reasoning, and how Texas law should have been applied.

### a. The Contracts

The Lease Agreement does not expressly mention Delta, although it provides for applications by "new entrant" airlines to commence service from

No. 16-10051

Love Field if a variety of conditions are fulfilled. For instance, the current holders of preferential gate leases may approve and sublease gates voluntarily to the new entrant. Alternatively, the City may, if it does not "unduly interfere" with the current holders' scheduled service, impose requirements upon the current holders to accommodate the new entrant.[2] If the new entrant is ultimately denied subleasing, however, the Lease Agreement affords no further redress.

The Lease Agreement does not stand alone. It was executed pursuant to the other arrangements that made possible the reform of the Wright Amendment, which prevented Southwest from flying out of Love Field to states non-contiguous to Texas. The Five Party Agreement among Southwest, American, the cities of Dallas and Fort Worth, and DFW Airport undergirded passage of the Wright Amendment Reform Act ("WARA"). Five Party Agreement, Art. I, § 1. That Agreement expressly rejects creating third party beneficiary status for any non-party. Art. II, § 11. Delta is not a party and played no role in the Five Party Agreement. To achieve its goal of being freed from the flight limitations embodied in the Wright Amendment, Southwest agreed in the Five Party Agreement to reduce the Love Field gates permanently from 32 to 20 and to keep only a proportionate percentage of the remaining gates (16 at first). Southwest also essentially agreed not to fly from DFW, as any leasing of gates there would require a one-for-one reduction of its preferential lease gates at Love Field. While the Five Party Agreement contemplated the possibility of accommodation to "new entrant" carriers at

---

[2] Denominating Delta a "new entrant" for any purpose stretches language and reality, but no large point about this conundrum seems to have been made in the district court. Delta not only is the second largest airline in the world, but it also holds gates at DFW Airport. And the DOJ, in evaluating the market for passenger airline services in the DFW metroplex area, has included DFW and Love Field as one functional market.

23

No. 16-10051

Love Field, it placed the onus on the City of Dallas either to facilitate voluntary arrangements with Love's existing carriers or "to require the sharing of preferential lease gates, *pursuant to Dallas' existing lease agreements.*" Five Party Agreement, Art. I, § 3.b.

Finally, the WARA statutorily acknowledges the inviolability of existing preferential gate leases under the Lease Agreement, in stating that the law

> shall not be construed to require the City of Dallas . . . to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity to new entrants or to create common use gates, unless such modification or elimination is implemented on a nationwide basis.

Wright Amendment Reform Act of 2006, PL 109–352, Oct. 13, 2006, 120 Stat 2011, § 5(e)(2)(B). This language clearly protects preferential gate holders and restricts accommodation of new entrants in the absence of nationwide reallocations.

The Five Party Agreement and the Lease Agreement are interdependent, and their status is enshrined in the WARA. Under each agreement and the statute, the rights of the contracting parties are protected, and the proscription of third party beneficiary status (or severe restriction on new entrant admissions) should be respected.

### b. The District Court's Reasoning

The district court equated Delta with a "new entrant" under the Lease Agreement and held that the Lease Agreement obligates Southwest to "accommodate" Delta in that capacity. *City of Dallas v. Delta Air Lines et al.*, No. 3:15-cv-02069-K, 2015 WL 3901862 at *22–23 (N.D. Tex., Dallas June 17, 2015) ("The Lease Agreement language does not limit the parties' accommodation obligation to an airline not currently operating at Love

24

Field . . . The Court agrees with Delta's proposed definition of 'new entrant'. Although the Lease Agreement language is not artfully drafted, the Court finds 'new entrant airline' to mean any airline that is not a Signatory Airline in a Lease Agreement with the City and an airline needing space at Love Field to provide service."). Southwest agreed, in Section 4.06(F) of the Lease Agreement, to accommodate a "requesting airline" at times that would not "unduly interfere" with Southwest's schedule. According to the court, this "duty owed to Delta is a contractual obligation or some other legally enforceable commitment . . ." and it is "clear and unequivocal that the City and the Signatory Airlines intended to directly benefit a 'new entrant airline' . . . with this accommodation provision." The court further concluded that Delta is a third party "creditor beneficiary" entitled to sue to enforce the agreement—not a mere "incidental beneficiary" under Texas law. As the court put it:

> If the City and Southwest as parties to the Lease Agreement did not intend for a 'new entrant airline' to have the right to enforce this section, there would be no other way for the accommodation procedure to work and no remedy for the 'new entrant airline' should the City and/or Southwest not comply with their agreement.

*City of Dallas v. Delta Air Lines et al.*, No. 3:15-cv-02069-K, 2015 WL 3901862 at \*24 (N.D. Tex., Dallas June 17, 2015). Given the "obligations" of the Lease Agreement toward a "new entrant," the court concluded, such new entrant must be able to sue. *Id*. at 23-24.

### c. Texas Law

Contrary to the district court's holding, Delta is not a third party beneficiary under Texas law. "Under Texas law, parties are presumed to be contracting for themselves only." *Fleetwood Enterprises, Inc. v. Gaskamp*,

280 F.3d 1069, 1075 (5th Cir.), *opinion supplemented on denial of reh'g*, 303 F.3d 570 (5th Cir. 2002). The Texas Supreme Court has clearly stated that "[a] court will not create a third-party beneficiary contract by implication . . . The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied." *MCI Telecommunications Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999). A third party may only sue to enforce a contract that it did not sign when "the parties to the contract entered the agreement with the clear and express intention of directly benefitting the third party." *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). Third parties can recover on a contract made by other parties "*only* if the parties intended to secure a benefit to that third party, and *only* if the contracting parties entered into the contract directly for the third party's benefit." *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (emphases added). The court construes the entire agreement and gives effect to all of its provisions so that no provisions are rendered meaningless. *Id.* at 590.

Once a third party beneficiary status is established, it must next be determined what type of third party beneficiary relationship exists between the parties. The district court classified Delta as a third party "creditor" beneficiary with standing to enforce the Lease Agreement. Creditor beneficiaries, as opposed to incidental beneficiaries, may bring suit to enforce a contract. *Allan v. Nersesova*, 307 S.W.3d 564, 571 (Tex. App. 2010). A party is considered a creditor beneficiary when "performance will come to satisfy a duty or legally enforceable commitment owed by the promisee." *S. Texas Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007). "[T]he focus is on whether the contracting parties intended, at least in part, to discharge an obligation owed to the third party." *Stine*, 80 S.W.3d at 591. But if the contract only

confers an indirect or incidental benefit, a third party cannot sue to enforce the contract. *Tawes*, 340 S.W.3d at 425.

### d.  Critique of the District Court

Section 4.06(F) states that existing preferential gate leaseholders "agree" to accommodate a "new entrant" on "reasonable terms" where such accommodation will "not unduly interfere" with the leaseholder's operating schedule "taking into consideration all the circumstances of such an accommodation agreement." This language, full of contingencies, hardly offers certainty to the new entrant. Moreover, if the existing preferential leaseholder fails to enter into a voluntary accommodation, the City steers any further decision-making process. Characterizing a "new entrant" as an intended creditor beneficiary of this provision misreads the Lease Agreement and violates the cardinal principles reaffirmed in Texas law. Third party beneficiary status is never to be implied. Here, the new entrant has no "rights" so clearly and fully spelled out as to enable a court to "enforce" the alleged obligation. That any "new entrant" may seek accommodation and potentially benefit from a gate sublease is a far cry from saying the disappointed entrant may force itself upon the contracting parties, much less obtain the "perpetual" sublease that the court preliminarily awarded Delta.

The court got off on the wrong foot in holding that "the duty owed to Delta is a contractual obligation or some other legally enforceable commitment under the contract." This conclusion proves too much. The court essentially extracted one sentence from Section 4.06(F) and engaged in an overly narrow parsing of the term "unduly interfere." Every third party beneficiary claim begins with the assertion that the contracting parties "intended" to confer benefits or status on the non-party. The analysis then turns on the extent to which the contract, read as a whole, has used the language of intentionality,

described the beneficiary with sufficient precision, and specified the beneficiary's status in a way that a court can enforce. The necessary careful analysis of the Lease Agreement was not undertaken here.

Read as a whole, Section 4.06(F) crafts an intricate mechanism for providing accommodations under some limited circumstances to new entrant applicants. A new entrant is required first to approach existing preferential gate lease holders for voluntary arrangements. Section 4.06(F)(2). Leaseholders are not required to succumb voluntarily, nor are their duties toward new entrants precisely spelled out. Instead, the leaseholder agrees to accommodate subject to "reasonable terms" that would not "unduly interfere" with the existing holder's operating schedule "taking into consideration all the circumstances." Section 4.06(F). To the extent this imposes an "agreement to agree" on the leaseholder, it is unenforceable in Texas law. *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 323 (5th Cir. 2006) ("[W]here an agreement leaves essential terms open for future negotiations, it is not a binding contract but, rather, an unenforceable 'agreement to agree.'"). As such, it is impossible to see how a third party beneficiary can claim a "contractual obligation or other legally enforceable duty" that directly contracting parties would not owe to each other.

In any event, if the new entrant exhausts its approach to existing leaseholders, the new entrant may approach the City, embarking on a contractually specified procedure whose course must be largely determined by the City. Section 4.06(F)(2). The City "*may* select" one of the current leaseholders to accommodate the new entrant. Section 4.06(F)(3). Texas law holds the word "may" is ordinarily permissive, not mandatory. *See GT Leach Builders v. Sapphire*, 458 S.W. 3d 502, 525 (Tex. 2015) ("[W]e find no basis on which to conclude that the parties intended the word 'may' to be mandatory

rather than permissive in this context."). Even if the City does so, however, the leaseholder may register its objection, Section 4.06(F)(3), and the City may rescind an order for accommodation. Section 4.06(F)(4). Through this point in the procedures, the new entrant never becomes legally entitled to receive accommodation. Only if the City finally requires one of the leaseholders to enter into an accommodation, might it be said that the new entrant's rights have matured into a legally enforceable obligation.[3] Critically, however, even if the City requires an existing leaseholder to accommodate a new entrant, Section 4.06(F)(4), "[i]n case of a conflict between schedules . . . the [existing leaseholder] will have priority in use of its personnel and its Leased Premises." Section 4.06(F)(4)(a).

A complete reading of Section 4.06(F) demonstrates that the district court inferred intended beneficiary status from one misdescribed sentence of the Lease Agreement while overlooking the contract's crucial implementation process for accommodations. Texas law does not permit implication of creditor beneficiary status in this way.

Other deficiencies in the court's interpretation of Section 4.06(F) undercut its third party beneficiary conclusion. First, the holding that Southwest's operating schedule was not "unduly interfered with" is suspect legally and factually. From a legal standpoint, this phrase acts in tandem with the remainder of the sentence allowing Southwest to insist on "reasonable terms" and "taking into consideration all the terms of such an accommodation agreement." The court never mentions these important limitations on the "duty" to accommodate. Factually, the court adopted an unrealistic snapshot

---

[3]  I do not speculate on that possibility, however, because the Section 4.06(F) procedures never went so far here.

in time by awarding Delta a permanent accommodation based on precisely the point at which Southwest was adjusting its schedule to begin wholly new airline service from Love Field throughout the United States. According to the WARA, Southwest remained constrained until October 13, 2014 to fly only to states adjacent to Texas (plus a couple others). WARA, § 2(b). Looking to the alleviation of that limit, Southwest had to evaluate changing market conditions nationwide, execute a publicity campaign, adjust its current and future schedules, and sell tickets well in advance in order to roll out the new service cost-effectively. That Southwest was undertaking plans to fully utilize its preferential lease gates from Love Field in the near future was widely known and anticipated. (After all, Southwest had fully utilized even more gates at Love Field before the Five Party Agreement came into existence.) Delta, in other words, exploited the single period when there might have been a gap in Southwest's immediate but hardly final operating schedule. By ignoring the demands of Southwest's business, which were created by the WARA timetable, the court failed to "take into consideration all the terms" such an accommodation would impose upon Southwest. The effect of the court's reasoning deprives Southwest, contrary to the Lease Agreement, the Wright Amendment, and the Five Party Agreement, of the benefit of its preferential lease status.[4]

---

[4] Allowing this "new entrant" to exploit a clearly temporary hiatus in the leaseholder's full use of its gates has two other adverse consequences. Any future "new entrant" can make use of temporary gaps in service to insist on its own accommodation, a result that could allow piecemeal nibbling away at the existing leaseholders' rights. Second, this interpretation detracts from the City's flexibility in determining when accommodations must be required, a flexibility clearly envisioned by the City's being provided access to monthly gate usage statistics from the leaseholders. Section 4.06(F). How the City chooses to use these statistics is eroded with a holding that temporary gaps in service must be filled with accommodation subleases.

No. 16-10051

Finally, contrary to the district court's reasoning, the accommodation provision is not rendered "superfluous" in the absence of a contractual "enforcement" mechanism.  It is the parties' contractual provisions, not the court's post hoc sense of fairness, that determines the scope of third party beneficiary status under Texas law.  An "accommodation" "agreement" as vague as the provisions embodied in Section 4.06(F) is simply not judicially enforceable.  *See KW Const. v. Stephens & Sons Concrete Contractors, Inc.*, 165 S.W.3d 874, 883 (Tex. App. 2005) ("If the terms are so vague that the court cannot determine what the parties intended or what terms to enforce, the contract is unenforceable.").  The "enforcement" here is in the hands of the City, hedged about with limits on existing leaseholders' duty to accommodate and the City's flexibility.  As has been noted, the City bears the laboring oar to ensure that accommodations, if authorized by the Lease Agreement and "all the circumstances," are effectuated.  The City, while in agreement with Southwest that Delta is not a third party beneficiary, maintains independent interests in maximum utilization of Love Field.  Moreover, to the extent the duty to accommodate may flow from federal law provisions, a matter not briefed or argued before this court, Delta had the ability to commence administrative proceedings before the relevant federal agency.  Rather than signal the need for judicial intervention, Section 4.06(F) was structured to maintain flexibility in the complex business of assigning, allocating, and negotiating airport gate leases.

For all these reasons, it cannot be maintained that Delta, even if a "new entrant" under the Lease Agreement, acceded to "rights" (what rights?), much less to a "perpetual" sublease from Southwest at Love Field.  The court no doubt acted with the best of intentions.  This preliminary injunction, however, did not interpret so much as impose a status on Delta to enforce invented

contract rights, completely bypassing the procedures and limits of Section 4.06(F).

I respectfully dissent.