

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-21-00188-CV

———————————————————

CL III FUNDING HOLDING COMPANY, LLC, Appellant

V.

STEELHEAD MIDSTREAM PARTNERS, LLC; STRATEGIC ENERGY
INCOME FUND III, LP; EAGLERIDGE ENERGY II, LLC; AND
EAGLERIDGE MIDSTREAM, LLC, Appellees

---

On Appeal from the 352nd District Court
Tarrant County, Texas
Trial Court No. 352-293713-17

---

Before Sudderth, C.J.; Birdwell and Womack, JJ.
Memorandum Opinion on Remand by Chief Justice Sudderth

## MEMORANDUM OPINION ON REMAND

This "long-running dispute" returns to us on remand. *Steelhead Midstream Partners, LLC v. CL III Funding Holding Co., LLC*, 709 S.W.3d 605, 605–08 (Tex. 2024).

Appellant CL III Funding Holding Company, LLC and Appellee Strategic Energy Income Fund III, LP co-owned a pipeline and related oil and gas interests (together, the Property), and they entered into a joint operating agreement (JOA) with Appellee Steelhead Midstream Partners, LLC—the Property operator—to provide for the Property's operations and the distribution of income and expenses. But the Property was subject to a preexisting statutory lien. Strategic took the position that CL III bore sole responsibility for the lien—claiming that CL III's predecessor had been to blame for the debt underlying the lien and that CL III had previously agreed to pay for it—but CL III disagreed. Regardless, the JOA did not separately address the lien, and it is undisputed that Steelhead never used the JOA's billing procedures to invoice CL III for the lien as a Property expense.

So CL III separately settled the debt with the lienholder, acquired the lien by assignment, and filed suit in Montague County to foreclose on the Property—the Property it co-owned with Strategic—in satisfaction of the lien. Strategic and Steelhead responded by filing this concurrent suit in Tarrant County, alleging that CL III had violated the JOA by failing to pay the lien debt and by filing suit for foreclosure.

The legal roller coaster continued from there. CL III secured a foreclosure judgment in Montague County, but the Tarrant County trial court later found that

2

CL III's actions had violated the JOA. This court then held that the Tarrant County lawsuit had been a collateral attack on the foreclosure judgment, but the Texas Supreme Court disagreed, distinguishing between the Property owners' shared liability to the lienholder for "the *construction debt* underlying the lien" and CL III's "separate *contractual debt* to [Strategic and] Steelhead" based on the parties' "separately agree[ing in the JOA], quite apart from the debt or the resulting lien, to share all expenses as between themselves." *Id.* at 607–08 (explaining that, "[p]roperly understood, [Strategic and] Steelhead's Tarrant County lawsuit seeks to establish not that the result of the foreclosure litigation was incorrect, but that the result of the foreclosure litigation triggers contractual obligations CL III owes to [Strategic and] Steelhead").

The case thus returns to us for a review of Strategic and Steelhead's breach of contract claim under the JOA.[1] The dispositive question is narrow: Did CL III's "separate[] agree[ment with Strategic and Steelhead] . . . to share all expenses as between themselves" either (1) require CL III to proactively calculate and pay for its share of the lien debt without receiving a bill from Steelhead for the amount; or (2) prohibit CL III from acquiring, holding, or enforcing the preexisting third-party lien on the Property? *Id.* The answer is no; the plain language of the JOA contained no such requirement or prohibition. We will reverse and render.

---

[1]Steelhead joined in Strategic's breach of contract claim, but it admitted that it had suffered no damages.

3

# I. Background

The parties have a lengthy and contentious history. And while much of that history is irrelevant to the dispositive issue—the JOA's plain language—it nonetheless shapes the arguments and judgment before us.

## A. Pre-JOA History

In 2011, CL III's and Strategic's predecessors in interest—WBH Energy, L.P. and U.S. Energy Development Corp. respectively—entered into a joint operating agreement to develop the Property, with each owning a 50% working interest and each paying 50% of the Property's expenses. WBH's affiliate served as the operator and hired Orr Construction, Inc. to build the Property pipeline, and although U.S. Energy later claimed to have paid its share of the pipeline construction expenses, the operator did not pay Orr, so Orr held a statutory lien on the Property.

Later, WBH (and its affiliate–operator) filed for bankruptcy. By then, Strategic had acquired U.S. Energy's interest in the Property, with U.S. Energy serving as Strategic's general partner. Nonetheless, in the course of the bankruptcy proceedings, U.S. Energy entered into a settlement agreement with one of WBH's lenders—CL III— regarding WBH's Property interest. According to U.S. Energy, it agreed to not oppose CL III's acquiring WBH's Property interest in exchange for CL III's agreeing that (1) it would not hold U.S. Energy liable for WBH's Property-related debts; and (2) it would allow a U.S. Energy affiliate to serve as the Property's operator. Time would tell that CL III understood the settlement differently. But either way, CL III acquired WBH's

Property interest, and U.S. Energy formed an affiliated corporate entity—Steelhead—to serve as the Property's operator. Meanwhile, Orr's statutory lien on the Property remained in place.

**B.    JOA**

This set the stage for the JOA.

In September 2015, the two Property owners—Strategic and CL III—and the operator—Steelhead—entered into a JOA to govern the Property's operations and the distribution of income and expenses. The JOA had several consistent themes.

One of those themes was that the owners bore individual liability for their respective shares of the costs and expenses. Multiple JOA provisions reiterated this, clarifying that each owner "shall be liable only for its Participating Interest of the costs of acquiring, construing, maintaining, repairing[,] and operating the [Property]" and that "[s]uch costs and expenses shall be determined by Operator in accordance with the terms of Exhibit 'C.'" Exhibit C, in turn, was a modified version of the 2005 Council of Petroleum Accountants Societies, Inc. (COPAS) Accounting Procedure for Joint Operation, which detailed how, when, and what the operator could bill to the owners. And the detailed nature of these billing procedures was another recurring theme in the JOA.

Indeed, much of the JOA—including the COPAS procedures—related to the operator's rights and responsibilities in its payment, billing, and collection of Property expenses. *Cf. Tawes v. Barnes*, 340 S.W.3d 419, 426 (Tex. 2011) (explaining that joint

5

operating agreements "are contract[s] typical to the oil and gas industry whose function is to designate an operator, describe the scope of the operator's authority, provide for the allocation of costs and production among the parties to the agreement, and provide for recourse among the parties if one or more default in their obligations" (internal quotation marks omitted)). The JOA required, for example, that the "Operator shall pay . . . all accounts . . . for services . . . and for materials supplied . . . and shall keep the [Property] free from Liens resulting therefrom except for Permitted Liens,"[2] and it stated that the Operator would "invoice each System Owner on a periodic basis" and "charge . . . [them] their respective share . . . of such costs and expenses."[3] The JOA specified how and to whom the operator should transmit its bills, and it clarified when a bill would be "deemed as delivered." The owners, for their part, were required, upon

---

[2]"Permitted Liens" was defined to include liens for obligations "that [we]re . . . not due or delinquent or, if due or delinquent, [we]re being contested in good faith by Operator in appropriate proceedings . . . so long as the proceedings d[id] not pose a risk of sale, forfeiture, or loss of any System Owner's interest."

[3]The COPAS procedures provided what, when, and how the invoicing was to be done. For example, the procedures stated that the operator would "bill the System Owners on or before the last day of the month for their proportionate share of the Joint Account for the preceding month," that "[s]uch bills [should] be accompanied by statements that identify the AFE (authority for expenditure)," and that "all charges and credits [must be] summarized by appropriate categories of investment and expense." The procedures also listed out categories of expenses that the operator "shall charge [to] the Joint Account" and bill to the owners, with one such category being "LEGAL EXPENSE[S]," i.e., the "fees and costs of handling . . . [or] discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property."

6

"receiving an invoice for payment . . . , within thirty (30) Days of the receipt of such invoice, [to] pay to Operator in cash the full amount of such invoiced amounts."[4] And if an owner "fail[ed], within the time and in the manner provided . . . to fully pay to Operator the invoiced amount," then the operator was required to "provide prompt notice to all System Owners of such event," and the operator was authorized to take certain enforcement actions, such as making a "Cash Call." Each owner granted the other parties to the JOA "a lien and/or security interest" on its Property interest "to secure performance of all of its obligations under th[e JOA]."[5]

## C.    Litigation

Less than a year after executing the JOA, in early 2016, CL III settled the pipeline debt with Orr and acquired the right to enforce Orr's statutory lien. Then, CL III sued U.S. Energy to foreclose on the Property in satisfaction of the Orr lien. But U.S. Energy denied liability for the statutory lien because, "pursuant to U.S. Energy's contractual

---

[4]The JOA allowed the operator to "reserv[e]" a portion of the net monthly revenue otherwise payable to an owner if the operator "deem[ed it] reasonably necessary or appropriate . . . based on Operator's projection of reasonably foreseeable expenses," and it provided a procedure for the operator to request an advance from the owners.

[5]The JOA emphasized that the parties' reciprocal liens were "given to secure only the debts of each severally"; that "no System Owner shall have any liability to third parties hereunder to satisfy the default of any other System Owner in the payment of any expense or obligation hereunder"; and that the parties were "free to act on an arm's-length basis . . . subject, however, to the obligation of the Parties to act in good faith in their dealings with each other with respect to activities hereunder."

7

obligations [under its prior operating agreement with WBH], it [had] paid its share of the pipeline construction costs."[6]  And when the foreclosure court indicated its intention to grant CL III summary judgment,[7] U.S. Energy pointed out that it did not even own the Property interest that CL III sought to foreclose—Strategic owned the Property interest.[8]

Around that same time, in August 2017, Strategic and Steelhead filed the present lawsuit in Tarrant County.  In their original petition, they alleged that CL III's foreclosure action breached the JOA, and they requested an antisuit injunction. Strategic was added as a party to the foreclosure litigation soon thereafter, and the Tarrant County trial court denied injunctive relief.[9]

---

[6]To support this defense, U.S. Energy attached copies of the invoices it had received from the WBH-affiliated operator along with evidence that U.S. Energy had paid the invoices.  U.S. Energy further asserted counterclaims against CL III for, among other things, breach of the operating agreement between WBH and U.S. Energy, and it argued that it held a lien on CL III's interest in the encumbered property.

[7]U.S. Energy alleged that CL III's initial foreclosure pleadings had not accurately identified the interests subject to foreclosure and that this error had not been corrected until CL III filed a proposed order for summary judgment in mid-2017.

[8]At the Tarrant County bench trial, U.S. Energy's former president testified that, because U.S. Energy was Strategic's managing general partner, it had considered itself responsible for protecting the Property in the foreclosure suit.  However, U.S. Energy's pleadings in the foreclosure suit had not mentioned Strategic until mid-2017, *see supra* note 7, and at that point, U.S. Energy had distinguished between itself and Strategic.

[9]Strategic and Steelhead later dropped their requests for injunctive relief.

8

**D.      Assignments to Eagleridge**

In the midst of this legal chaos, both Strategic and CL III sold their Property interests to Appellee Eagleridge Energy II, LLC, effective November 1, 2017.[10] As part of Eagleridge's contract with CL III, Eagleridge agreed that it would be "responsible for all costs, expenses, claims, liabilities, and obligations arising from or related to the ownership, operation and maintenance of the Properties . . . attributable to periods from and after" the date of sale.

Despite this, the legal battles continued.  More than two years later, in December 2019, CL III obtained a foreclosure judgment against the Property.  Eagleridge paid the judgment[11] and intervened in the present litigation, aligning itself with Strategic and Steelhead (collectively, the Strategic Entities).

**E.      Bench Trial**

The Strategic Entities' breach of contract action ultimately proceeded to a bench trial.[12]  The primary thrust of the Strategic Entities' complaint was that CL III had

---

[10]The JOA contemplated a system owner selling its Property interest and assigning its rights under the JOA, and "[i]n the event of [such] a permitted assignment of th[e JOA], the assigning System Owner [would] be released of any and all liabilities hereunder accruing after the effective date of such sale."

[11]By the time of the foreclosure judgment, Eagleridge Energy had assigned its Property interests to Appellee Eagleridge Midstream, LLC (together, Eagleridge).

[12]The bench trial involved multiple other claims that are not at issue in this appeal.

9

violated the JOA by forcing Strategic to pay for CL III's share of the Orr lien expense and by filing a foreclosure action to achieve that end.

However, at trial, the Strategic Entities' witnesses acknowledged that Steelhead had not billed CL III for the lien as a JOA expense. In fact, one of Steelhead's two corporate representatives confirmed that she did not recall Steelhead's ever sending CL III an invoice requesting payment under the JOA. She explained that Steelhead "would typically send a monthly Settlement Statement along with a Joint Interest Billing to the owners" and those documents "would set forth the gross amount of revenues generated and owed to the owners, the amount of expenses[,] and then the resulting net amount of revenues that [was] going to be paid to the owners." Steelhead's representative remembered the Property revenue as generally being sufficient to cover CL III's expenses; she could not recall an instance when there was a shortage and Steelhead had sent CL III a demand for payment. And when the representative was asked about the final settlement statement that Steelhead had sent to CL III—the November 2017 settlement statement—the representative confirmed that it showed no unpaid invoices at that time.[13]

---

[13]A partner in the private equity firm that owned CL III testified similarly, stating that Steelhead never sent CL III "an invoice for amount owed" or "a cash call for amounts owed under [the JOA]" and that CL III's final settlement statement showed that nothing was owed. A representative from CL III's accounting firm—which firm CL III had hired to review its JOA-related financial documents—corroborated this as well.

U.S. Energy had assisted Steelhead in issuing of settlement statements, and the company's former president similarly confirmed that Steelhead had not invoiced CL III for the Orr lien amount. He explained that Steelhead's settlement statements had been "just for activity related for th[at] month" and that the Orr lien had been a contingent liability that "was not yet determined" while CL III owned its Property interest. Thus, according to U.S. Energy's former president, Steelhead would not have invoiced either Strategic or CL III for the Orr lien expense until "resolution of that [foreclosure] lawsuit."[14] And because Strategic and CL III had assigned their Property interests to Eagleridge before the foreclosure lawsuit's resolution, Steelhead never sent CL III a bill for the lien expense. When U.S. Energy's former president was asked if "Steelhead, Strategic, or [U.S. Energy] ever sen[t] CL III a notice of default" for its failure to pay the lien expense, he responded, "We sent them the [Tarrant County] lawsuit."

## F. Judgment

After hearing the evidence, the trial court found that CL III had breached the JOA by (1) failing to pay its share of the Property's expenses and (2) seeking to hold Strategic liable for those costs through the foreclosure litigation. In the trial court's detailed (and amended) findings of fact and conclusions of law, it found that

---

[14]In contrast, Steelhead billed its monthly foreclosure-related legal fees to the owners—including CL III—by deducting such fees from the owners' Property revenue in their monthly settlement statements.

11

- Under the bankruptcy settlement, "CL III agreed that U.S. Energy was not responsible for any alleged failure to pay for Orr Construction costs, and that CL III gave up its right to make any such claim against U.S. Energy";

- "Steelhead[] was required to protect the pipeline from liens and foreclosure" and could "pay [Property] expenses out of the joint account and then charge the owners for their individual share[s]";

- Based on the JOA's definition of "Permitted Liens," neither "CL III nor Strategic (as owners) were permitted to put a lien on the [Property] that subject[ed] the other owner's interest [to a] risk of foreclosure";

- Under Article 9.2 of the JOA, "CL III and Strategic were each responsible for paying their 50% share 'of the costs and expenses attributable to the ownership, maintenance, repair[,] and operation of the [Property],' as those costs and expenses [we]re dictated in Exhibit C";

- Under Article 10.6 of the JOA, CL III's "liability for paying its share of expenses was individual," its "liabilities for debts to third parties like Orr was not a joint liability of the co-owner Strategic," and it was "contractually required to act in good faith in [its] dealings under the [JOA]";

- "CL III breached the [JOA] by failing to pay its sole obligation for [the lien amount] of the unpaid Orr construction costs"; and

- "CL III breached its duty of good faith by its actions in seeking to foreclose the Orr Lien against Strategic."

The trial court awarded the Strategic Entities approximately $2 million—a figure that included (1) attorneys' fees incurred in the foreclosure suit, (2) the amount Eagleridge had paid to satisfy the foreclosure judgment, (3) attorneys' fees and contingent appellate attorney's fees in the Tarrant County lawsuit,[15] and (4) prejudgment interest "from August 7, 2017."

---

[15]The JOA stated that, "[i]n the event any Party [wa]s required to bring legal proceedings to enforce any obligation of a Party hereunder, the prevailing Party in such

12

## II. Discussion

CL III raises numerous issues on remand,[16] but this appeal is about one thing: the JOA.[17] This is not about the bankruptcy settlement between CL III and

---

action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee." The trial court relied upon this JOA provision for an award of attorney's fees.

[16]CL III lists seven issues: (1) whether there is legally or factually sufficient evidence that CL III breached Articles 9.2 and 10.6 of the JOA as the trial court found; (2) whether the voluntary payment rule bars the Strategic Entities' recovery given Eagleridge's payment of the foreclosure judgment; (3) whether the Strategic Entities can recover their foreclosure-related attorneys' fees as actual damages; (4) whether the JOA's prohibition on consequential, special, and indirect damages prohibits the Strategic Entities' recovery; (5) whether reversal on any of the previously listed grounds also requires reversing the attorneys' fees award for this Tarrant County litigation; (6) whether the award of attorneys' fees is excessive or unreasonable; and (7) whether the trial court's calculation of prejudgment interest violates Texas law.

[17]The timeframe for CL III's alleged breach is also narrow and turns on CL III's actions prior to the foreclosure judgment. Before trial, the parties stipulated that CL III had assigned its Property and JOA interests to Eagleridge effective November 1, 2017, and that Eagleridge had agreed to be "responsible for all costs, expenses, claims, liabilities, and obligations arising from or related to the [Property] . . . attributable to periods from and after [that date]." The JOA similarly released CL III from liability that accrued post-assignment. The trial court, for its part, implicitly identified the date of breach as August 7, 2017—the day on which Strategic and Steelhead filed their Tarrant County lawsuit—by awarding pretrial interest from that date. And the trial court entered a related finding that "[t]he Tarrant County [lawsuit] constitute[d] notice of Steelhead's intent to withhold [revenue to pay CL III's share of expenses] under [the JOA]."

So although the Strategic Entities repeatedly assert that the "foreclosure judgment trigger[ed] contractual obligations CL III owe[d] to [them]"—attempting to situate their claims within those contemplated by the Texas Supreme Court—their allegations of breach instead rely upon CL III's actions prior to the foreclosure judgment. *Cf. Steelhead*, 709 S.W.3d at 607–08 (distinguishing between the issue at the center of the foreclosure litigation and the Strategic Entities' allegations that "the result

U.S. Energy. Even assuming that CL III agreed to pay the Orr lien debt in that settlement—or in some other agreement with some other party—such assumption says nothing about CL III's obligations under the JOA.

The trial court found that CL III breached "Articles 9.2 and 10.6" of the JOA by (1) "failing to pay its share of the Orr . . . Lien" and by (2) "seeking to foreclose the Orr Lien against Strategic." CL III does not dispute that it failed to pay the Strategic Entities for the lien amount, nor does it dispute that it acquired, held, and foreclosed upon the lien. The question is whether these undisputed actions violated the JOA. And that is a matter of contract interpretation.

## A.     Standard of review:  Our de novo review turns on the JOA's plain language.

The meaning of an unambiguous contract is a question of law that we review de novo. *Tawes*, 340 S.W.3d at 425 (construing joint operating agreement); *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (same); *see Cromwell v. Anadarko E&P Onshore, LLC*, 716 S.W.3d 515, 521–22 (Tex. 2025) (construing mineral leases and noting that a lease "is just another type of contract, so general contract-interpretation principles govern"). We focus on the contract's plain language, seeking to decipher the intent expressed in "the written agreement that won the[ parties'] mutual assent." *Cromwell*, 716 S.W.3d at 521–22; *see Apache Corp. v. Apollo Expl., LLC*, 670

---

of the foreclosure litigation trigger[ed] contractual obligations CL III owe[d] to [Strategic and] Steelhead" under the JOA).

14

S.W.3d 319, 336 (Tex. 2023). We examine the entire writing to harmonize and give effect to all provisions. *Tawes*, 340 S.W.3d at 425; *Seagull Energy*, 207 S.W.3d at 345; *Nortex Mins., L.P. v. Blackbeard Operating, LLC*, No. 02-23-00027-CV, 2023 WL 7401052, at *5 (Tex. App.—Fort Worth Nov. 9, 2023, no pet.) (mem. op.). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Tawes*, 340 S.W.3d at 425; *Seagull Energy*, 207 S.W.3d at 345. Evidence of surrounding circumstances—such as a prior bankruptcy settlement with a different entity, for example[18]—cannot "justify interpreting the [contract] to say what it unambiguously does not say." *Cromwell*, 716 S.W.3d at 522 (internal quotation marks omitted).

## B. No breach: The JOA did not require CL III to pay an unbilled expense.

Of the two JOA breaches that the trial court found, the first stemmed from CL III's failure to pay for at least 50%—if not 100%—of the Orr lien expense. The trial court concluded that Articles 9.2 and 10.6 of the JOA made "each [owner] responsible for paying their 50% share 'of the costs and expenses attributable to . . . [the Property],' as those costs and expenses [we]re dictated in Exhibit C of the [JOA]"; that "CL III was individually obligated to pay for the Orr Lien"; and that "CL III never paid

---

[18]The Strategic Entities assert that the bankruptcy settlement was relevant to establishing "that CL III [had] assumed sole liability for the Orr debt when it agreed that it would not hold [U.S. Energy] or Strategic liable for WBH's unpaid debts." But U.S. Energy did not sue CL III for breaching the bankruptcy settlement. Again, the sole contract at issue is the JOA.

15

its share of the Orr Lien pursuant to its obligations under the [JOA]."  But these findings overlook the billing procedures necessary to trigger CL III's payment obligation under the JOA.

The JOA provided that the "costs and expenses" the owners were required to pay—including the costs to "keep the [Property] free from Liens"—would be "determined by [the] Operator in accordance with the terms of Exhibit 'C,'" i.e., the COPAS procedures.  [Formatting altered.]  The COPAS procedures reaffirmed that the "costs of handling, settling, or otherwise discharging litigation, claims, and liens . . . necessary to protect or recover the [Property]" were among those that the operator "shall charge the Joint Account" and bill to the owners.[19]  And more importantly, the COPAS procedures detailed how and when the operator— Steelhead—was to invoice the owners "for their proportionate share[s] of the Joint Account for the preceding month."  It was only then, "within thirty (30) Days" of receiving the bill, that the owners were required to pay the operator for the expense.  In other words, the JOA (and its COPAS procedures) made the operator's bill the trigger for the owners' payment obligations.

We indirectly recognized as much in a similar case:  *CabelTel International Corp. v. Chesapeake Exploration, L.L.C.*, No. 02-11-00224-CV, 2012 WL 2849289, at *1–4 (Tex.

---

[19]Indeed, the Strategic Entities champion this portion of the JOA in their discussion of other, non-dispositive appellate issues.

16

App.—Fort Worth July 12, 2012, pet. denied) (mem. op. on reh'g). There, the operating agreement was between an operator and a "non-operator," the parties agreed to be responsible for their shares of the costs and expenses, and the agreement incorporated a version of the COPAS procedures.[20] *Id.* at *1–2, *4 n.3. Much like the JOA, the agreement in *CabelTel* provided that the operator "shall bill [the non-operator] on or before the last day of each month for [its] proportionate share of the Joint Account for the preceding month," and it required the non-operator to pay each bill within a certain number of days of receiving it. *Id.* at *1–2. Ultimately, the operator alleged that the non-operator had failed to pay its share of the expenses, and it sued for breach of contract. *Id.* Following a summary judgment in the operator's favor, we considered the non-operator's argument that there was insufficient evidence that it had received the monthly bills. *Id.* at *2. And in so considering, we recognized that the non-operator's payment obligation had not been "triggered" unless and until it had received the operator's bills. *See id.* at *2–4. For some of the unpaid bills, the evidence showed that the non-operator had copies of them, thereby confirming that the non-operator had received them. *Id.* at *2. But for other unpaid bills, the evidence did not establish that the non-operator had received them. *Id.* at *3–4. And absent such evidence, we

---

[20]The parties in *CabelTel* incorporated a different version of the COPAS procedures; they used the 1984 procedures, whereas Exhibit C to the JOA reflected the 2005 procedures. *See* 2012 WL 2849289, at *4 n.3. Nonetheless, *CabelTel* is instructive.

17

held that the operator had not conclusively proven that the non-operator's payment obligation "w[as] triggered." *Id.*

The JOA here contained the same "trigger[]" for the owners' payment obligations. *See id.* The JOA stated that Steelhead "shall bill [the owners] on or before the last day of the month for their proportionate share[s] of the Joint Account for the preceding month" and that each "Owner receiving an invoice for payment shall, within thirty (30) Days of the receipt of such invoice, pay to Operator in cash the full amount of such invoiced amounts." *See id.* at *2–4. The Strategic Entities claim that CL III breached the JOA by failing to pay its share of the expenses—just as the operator claimed in *CabelTel, id.* at *1–2—but unlike *CabelTel*, Steelhead does not claim to have sent CL III an invoice for the unpaid amount.

To the contrary, it is undisputed that Steelhead never billed CL III for the cost of the Orr lien.[21] Rather, the Strategic Entities insist that "no invoice was ever required" because "CL III's throughput fees and revenues were [consistently] enough to cover its share of the monthly costs and expenses."[22] In fact, the Strategic Entities go further,

---

[21]The trial exhibits included 2018 invoices asking CL III to pay certain legal expenses, but one of Steelhead's corporate representatives acknowledged that the invoices may have been issued in error as they appeared to have billed for services rendered after the date of CL III's assignment to Eagleridge. Regardless, on appeal, the Strategic Entities do not mention these invoices; rather, they concede that no invoice was sent and insist that none was required.

[22]The Strategic Entities also contend that they notified CL III of its obligation to pay the Orr lien—and thus effectively invoiced it and gave it notice of default—via U.S. Energy's pleadings in the foreclosure litigation. But this argument fails on multiple

asserting that invoicing the statutory lien would have been inappropriate because the lien "was a contingent liability" until the foreclosure court entered its judgment.[23] Yet in the same breath, they insist that, if Steelhead had wanted to bill CL III for the Orr lien, it would have had the authority to do so because the JOA "allowed Steelhead to bill a System Owner for contingent liabilit[ies]."[24]

But the Strategic Entities cannot have their cake and eat it too. If the lien did not qualify as a Property expense until the foreclosure court entered its judgment, then it was not a JOA expense during CL III's period of ownership. And if Steelhead could have billed CL III for the lien anyway—contingent or not—then it cannot blame CL III for its decision not to do so.[25] Either way, the argument leads nowhere because the

---

fronts. First, U.S. Energy's pleadings in the foreclosure litigation made no mention of the JOA until mid-2017. And second, when U.S. Energy did mention Strategic and the JOA, it did so to distinguish between itself and Strategic. And this makes sense because U.S. Energy was, in fact, a distinct legal entity.

[23]Before trial, the parties stipulated that "[a]s operator under the [JOA], Steelhead sent monthly Settlement Statements to CL III showing amounts CL III owed for Steelhead's operation of the [Property] and amounts Steelhead owed to CL III for revenues generated from Steelhead's operation of the [Property]."

[24]The Strategic Entities further defend Steelhead's decision to withhold funds from CL III's final Property revenue payments to cover a portion of the contingent lien expense. But the relevant JOA provision—Article 10.2—authorized Steelhead's withholding of revenue after a party was in default, and the question here is whether CL III's payment obligation was triggered such that it was in default at all.

[25]In one portion of the Strategic Entities' brief, they reason that, if Steelhead had paid the Orr lien in the foreclosure litigation, "it would then have had to charge the expense back to the owners," which would have meant "charg[ing] the remaining cost to repay the lien against CL III, the only owner who still had an unpaid balance for the

19

undisputed evidence established that CL III was not billed for the lien expense under its "separate[] agree[ment with Strategic and Steelhead] . . . to share all expenses," *Steelhead*, 709 S.W.3d at 607–08, so its payment obligation under the JOA was never "triggered," *CabelTel*, 2012 WL 2849289, at *2–4. Nothing in the JOA required CL III to identify the Property's liens or contingent liabilities, allocate itself a share of those expenses,[26] and volunteer the money to Steelhead in advance—without an invoice, joint interest billing, settlement statement, or similar demand for payment. Thus, CL III did not have a contractual obligation to "pay some amount to Steelhead . . . to settle the parties' accounts under their JOA" based on the unbilled Orr lien expense. *See Steelhead*, 709 S.W.3d at 607–08.

The trial court's judgment cannot be sustained on this basis.

## C. No breach: The JOA did not prohibit CL III from acquiring, holding, or foreclosing on the lien.

The other breach found by the trial court condemned CL III's "actions in seeking to foreclose the Orr Lien against Strategic." On appeal, the Strategic Entities defend and expand upon this finding, asserting that CL III breached the JOA not only by

---

construction costs." But while such reasoning speaks to the circular nature of the foreclosure proceedings, it does not change the actions necessary to trigger CL III's payment obligation under the JOA.

[26]Even Steelhead's two corporate representatives gave differing deposition testimony as to how much of the Orr lien they believed CL III was responsible for paying. One representative testified that CL III "need[ed] to pay the entirety of that" while the other stated that CL III owed "[h]alf of the [lien amount]."

foreclosing on the Orr lien but also by acquiring and holding the lien at all.[27] They (1) emphasize that the Orr lien was not a "Permitted Lien"; (2) highlight that the JOA provided for "several, not joint or collective" liability to third parties for debts arising under the JOA; and (3) assert that, reading the JOA as a whole, "neither party c[ould] encumber [or foreclose upon] the other['s] interest, regardless of when that lien arose." But none of the JOA provisions that the Strategic Entities cite—nor anything else in the JOA—prohibited the owners from acquiring, holding, or foreclosing on a preexisting third-party lien.

The JOA's definition of "Permitted Liens" was just that: a defined term. A defined term is not a contractual prohibition. Moreover, the JOA used this defined term for one purpose and that was to impose a duty on a different party: the operator. The JOA stated that the operator—not the owners—bore the responsibility to keep the Property free from liens other than "Permitted Liens." Nothing in the JOA prohibited the owners from acquiring Property liens—"Permitted" or otherwise.[28] *Cf. Cromwell*,

---

[27]Although the trial court found that "[n]either CL III nor Strategic (as owners) were permitted to put a lien on the [Property] that subjects the other owner's interest at risk of foreclosure"—citing the JOA's definition of "Permitted Liens"—the trial court did not expressly conclude that CL III had breached this JOA provision. Nonetheless, the Strategic Entities assert as much on appeal.

[28]The JOA's reference to "good faith" does not change the result. As the Strategic Entities acknowledge, a contractual "good faith" provision is merely a lens through which the other contract requirements must be viewed; it does not create a contractual duty on its own. *See Dall./Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 369–70 (Tex. 2019) ("[A] contractual duty to act in good faith does

716 S.W.3d at 523–25 (criticizing court of appeals for reading requirement into contract based on parties' general intent and noting that "[c]ourts are not authorized to ensure that every provision [in a contract] comports with some grander theme or purpose" (internal quotation marks omitted)).

Nor did the JOA's provision for "several, not joint or collective" liability amount to such a prohibition. The Strategic Entities emphasize that the JOA made the owners "liable only for [their] Participating Interests of the costs" and stated that "no System Owner shall have any liability to third parties hereunder to satisfy the default of any other System Owner in the payment of any expense or obligation hereunder." But the Orr lien did not arise "hereunder" the JOA, and it was not a liability "to satisfy the default of [one of the then-current] System Owner[s] in the payment of any expense or obligation hereunder" the JOA. The Orr lien was a preexisting encumbrance based on "the parties' obligations to the construction company under the agreements giving rise to that debt." *Steelhead*, 709 S.W.3d at 607–08 (distinguishing between liability for the Orr lien debt and breach of the JOA). CL III did not create the lien; it merely acquired a lien that already existed. And while Strategic and CL III agreed to pay their own "Participating Interests of the costs" under the JOA, as we have already explained,

---

not create a new obligation . . . [but] merely governs the conduct by which the party must fulfill the contractual obligation to which it applies." (footnote omitted)).

22

nothing in the JOA required the owners to calculate their own shares of the costs and volunteer payment to Steelhead without an invoice, bill, or similar demand for payment.

The JOA did not prohibit the owners from filing foreclosure proceedings either. In fact, the JOA contemplated foreclosure proceedings in certain contexts. It stated that, if an owner's "failure to perform [the JOA] subject[ed] such System Owner to foreclosure or execution proceedings pursuant to the provisions of this [JOA]," then the defaulting owner would waive certain rights and "grant[] to the other System Owners a power of sale as to any property that [wa]s subject to the lien and security rights granted hereunder."[29] The JOA's plain language thus expressly approved one owner's foreclosing on another owner's interest to address non-performance of the JOA. Had the parties intended to prohibit all other foreclosure actions against one another, they could have said so. *See Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained."). But they did not. And "we will not squint to discover requirements [or prohibitions] that the parties themselves chose not to write into the memorialization of their bargain." *Cromwell*, 716 S.W.3d at 518 (interpreting mineral leases).

---

[29]The JOA also authorized the operator to "invoke or utilize the mechanics' or materialmen's lien law"—the same law underlying the Orr lien—"to secure the payment to Operator of any sum due hereunder."

23

In short, nothing in the JOA's plain language prohibited CL III from acquiring, holding, or foreclosing on a preexisting, third-party Property lien. While the Strategic Entities may have considered CL III's actions underhanded, nothing in the JOA prohibited those actions. The breach of contract judgment cannot be upheld on this basis, leaving nothing to support it.

We sustain CL III's dispositive issue.[30]

---

[30]Because this issue is dispositive, we need not address CL III's other challenges to the judgment. *See* Tex. R. App. P. 47.1.

### III. Conclusion

The JOA's plain language did not require CL III to proactively calculate and volunteer payment for its share of a Property expense without a bill from Steelhead to trigger CL III's payment obligation. Nor did the JOA's plain language prohibit CL III from acquiring, holding, or foreclosing upon a preexisting, third-party Property lien. We therefore reverse the trial court's breach of contract judgment—including its awards of damages and attorneys' fees[31]—and we render judgment that the Strategic Entities take nothing on their breach of contract claim.[32] *See* Tex. R. App. P. 43.2(c).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: January 8, 2026

---

[31]The Strategic Entities are no longer the "prevailing Part[ies] . . . entitled to recover . . . a reasonable attorney's fee" under the JOA. *See supra* note 15.

[32]The portions of the judgment not challenged on appeal remained unchanged.